MAGGIE BRIDGES, ADMINISTRATRIX OF THE ESTATE OF ALEX BRIDGES, DECEASED, v. MAGGIE J. GRAHAM, ADMINISTRATRIX OF THE ESTATE OF WILLIAM GRAHAM, DECEASED.

(Filed 7 June, 1957.)

**1. Appeal and Error § 23—**

   Assignments of error to the admission of evidence should state with particularity the alleged incompetent evidence and definitely present the question for review without the necessity of a search through the record to find the challenged evidence. Rules of Practice in the Supreme Court Nos. 19(3) and 27½.

**2. Evidence § 18—**

   ·Signed statements of witnesses are competent upon the trial for the purpose of corroborating their testimony consistent therewith, and the trial court has the discretion to permit the introduction of such statements for this restricted purpose prior to the cross-examination of the witnesses.

**3. Trial § 22a—**

   Upon motion to nonsuit, plaintiff is entitled to have his evidence considered in the light most favorable to him, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom.

**4. Trial § 22b—**

   So much of defendant's evidence as is favorable to plaintiff or tends to explain or make clear that which has been offered by the plaintiff may be considered, but that which tends to establish another and a different state of facts, or which tends to contradict or impeach plaintiff's evidence is to be disregarded.

**5. Trial § 22c—**

Discrepancies and contradictions, even in plaintiff's evidence, do not justify nonsuit.

**6. Automobiles § 41p—**

The question of fact as to which occupant of an automobile was the driver at the time of the fatal accident may be proved by circumstantial evidence, either alone or in combination with direct evidence.

**7. Same—Circumstantial evidence that defendant's intestate was driving at time of fatal accident held sufficient to be submitted to jury.**

Evidence to the effect that defendant's intestate kept the car in question at his house, had driven it and claimed ownership for two or three months, was seen driving it about an hour prior to the fatal wreck, with plaintiff's intestate a passenger, riding in the back with his shoes off, and that both intestates were killed in the accident resulting from the driving of the car at excessive speed and in a reckless manner in violation of statutes, with further evidence that the body of plaintiff's intestate was found without shoes after the wreck, *is held* sufficient to be submitted to the jury upon the ultimate fact of whether defendant's intestate was driving the automobile at the time of the accident.

APPEAL by defendant from *Hall, J.,* December Term 1956 of SCOTLAND.

Civil action for damages for the death of plaintiff's intestate.

Plaintiff alleges in her complaint that on Sunday morning, 18 December 1955, her intestate was riding as a guest passenger in a Tudor 1950 Ford automobile owned by Pres Johnson, and driven by William Graham, defendant's intestate. That about 8:00 a.m. on this morning defendant's intestate was driving this automobile eastwardly along U. S. Highway 15 and entering the corporate limits of the Town of Laurinburg at a speed of 80 miles an hour. That as he approached a curve in the highway he lost control of the automobile, and it turned over several times instantly killing plaintiff's intestate. That the death of her intestate was proximately caused by the negligence of defendant's intestate in driving the automobile at an excessive and unlawful speed and in a reckless and careless manner.

Defendant in her answer denied that her intestate was driving the automobile, and alleged that it was being driven by plaintiff's intestate at the time it overturned. Her allegations as to the speed of this automobile when it entered the corporate limits of Laurinburg and its overturning in the curve of the highway are identical with the complaint's allegations, and she alleges that the overturning of the automobile instantly killed her intestate. Defendant in her answer alleged a counter-claim that plaintiff's intestate was driving this automobile at the time it overturned instantly killing her intestate, and that her intestate's death was proximately caused by negligence of plaintiff's intes-

tate in the driving of the automobile: such allegations of negligence against plaintiff's intestate being identical with the allegations of negligence in the complaint against her intestate.

The court submitted four issues to the jury: one, was the death of plaintiff's intestate caused by the negligence of defendant's intestate, two, an issue of damages, three, was the death of defendant's intestate caused by the negligence of plaintiff's intestate, and four, an issue of damages. The jury answered the first issue Yes, the second issue $5,000.00, and the third issue No.

From judgment entered upon the verdict, defendant appeals.

*Joe M. Cox and Jennings G. King for Plaintiff, Appellee.*
*Mason & Williamson for Defendant, Appellant.*

PARKER, J. Defendant has seven assignments of error: five as to the admission of evidence, and two as to the failure of the court to allow her motion for judgment of nonsuit, first made at the close of plaintiff's case, and renewed at the close of all the evidence.

The five assignments of error as to the admission of evidence all relate to the admission in evidence of prior consistent signed statements of certain of plaintiff's witnesses for the purpose of corroborating these witnesses, which statements were marked as Exhibits. Four times the court instructed the jury that these statements were offered and admitted in evidence only for the purpose of corroboration, if the jury found the statement corroborated the witness who made the statement: that the statements were not substantive evidence.

Each of these five assignments of error are phrased in identical words, except for the numbers of the Exhibit, the Exception and the record page. The first assignment of error reads: "For that the Court erred in overruling the defendant's objection to the introduction of Plaintiff's Exhibit No. 1; As set forth in Exception #2 (R. p. 12)." Nothing else appears in this assignment of error, and in the other four relating to the admission of evidence. These five assignments of error do nothing more than refer to the pages of the record where the statements are set forth.

An assignment of error as to the admission of evidence should be definitely and clearly presented, and the Court not required to go beyond the assignment itself to learn what the question is. *Steelman v. Benfield,* 228 N.C. 651, 46 S.E. 2d 829. In *McDowell v. Kent,* 153 N.C. 555, 69 S.E. 626, the Court said: ". . . the points determinative of the appeal, shall be stated clearly and intelligibly by the assignment of errors and not by referring to the record." In *Thompson v. R. R.,* 147 N.C. 412, 61 S.E. 286, the Court quoted this language from 2 Pleadings and Practice, p. 943: " 'The assignment must be so specific that the

Court is given some real aid and a voyage of discovery through an often voluminous record not rendered necessary.' "

The purported assignments of error as to the admission of evidence do not throw the slightest light upon the questions of evidence we are asked to pass on, and do not comply with Rule 19(3) and Rule 27½ of our Rules of Practice in this Court. *Cecil v. Lumber Co.,* 197 N.C. 81, 147 S.E. 735; *Ellis v. R. R.,* 241 N.C. 747, 86 S.E. 2d 406; *S. v. Mills,* 244 N.C. 487, 94 S.E. 2d 324; *Tillis v. Cotton Mills,* 244 N.C. 587, 94 S.E. 2d 600. What the Court desires, and it would seem the least that an appellate court requires, is that assignments of error as to the admission of evidence shall state with particularity the alleged incompetent evidence, and not require a search through the record to find the challenged evidence.

While the assignments of error as to the admission of evidence are insufficient, we have examined the statements admitted in evidence, and no prejudicial error appears in their admission in evidence for the sole purpose of corroboration. The admission of these prior consistent statements by the witnesses before they were cross-examined was within the discretion of the trial judge. *Gregg v. Mallett,* 111 N.C. 74, 15 S.E. 936; *Burnett v. R. R.,* 120 N.C. 517, 26 S.E. 819; *S. v. Smith,* 218 N.C. 334, 11 S.E. 2d 165; *S. v. Sutton,* 225 N.C. 332, 34 S.E. 2d 195; Stansbury's North Carolina Evidence, p. 82 and note 27 on that page.

This is a summary of plaintiff's evidence: Plaintiff is the administratrix of Alex Bridges, and defendant the administratrix of William Graham. When the Ford automobile overturned and wrecked on Sunday morning, 18 December 1955, about 8:15 a.m., Alex Bridges, William Graham and his uncle, John Graham, were riding in it, and Alex Bridges and William Graham were instantly killed and John Graham was injured. About 5:00 p.m. on the Saturday before his death William Graham and his brother, Hardy, came to John Graham's home in a Ford automobile. William Graham was driving the automobile when he came, and was driving it when he left. When William Graham was told John Graham was not at home, he left. About 6:30 a.m. the next day William Graham drove the Ford automobile again to John Graham's home. Alex Bridges came with him. In about 30 minutes William Graham, Alex Bridges and John Graham left in the Ford automobile, with William Graham driving. John Graham's home is about 12 miles from Laurinburg.

Webster McCall's home is 3 or 4 miles from John Graham's home. On this Sunday morning William Graham, Alex Bridges and John Graham came to Webster McCall's home in a grey Ford automobile. Webster McCall testified: They arrived about 6:30 a.m.; "I am estimating the time about ten months after it happened." William Graham said to McCall: "Let me show you what I have under the hood of my

car, want you to hear it sound off." William Graham got in the car, cranked it up, and McCall said: "Boy, it sounds good." There was a new motor under the hood. McCall had seen William Graham drive this automobile before: he always saw William Graham with this automobile. In 25 or 30 minutes after their arrival the three persons who came in the automobile, left in it. McCall was in his house when they arrived and left, and does not know who was driving.

Louise McCall, wife of Webster McCall, was at home this Sunday morning. She does not know who was driving the automobile. On cross-examination she testified: "Alex Bridges told me that he drove the car up there, and guessed he would drive it off. They all looked like they had been drinking."

Ernest Monroe operates a store and a Purol Service Station on U. S. Highway 15 about 10 or 12 miles from Laurinburg. On this Sunday morning between 7:00 and 8:00 a.m. William Graham drove a grey Ford automobile up to Monroe's gas tank, and stopped. Monroe testified: "He (William Graham) had bought gas from me several times; he was driving at these times; I never saw anybody else driving his car." When the automobile came up, John Graham was sitting beside William Graham on the front seat, and Alex Bridges was lying on the back seat with his shoes off. William Graham bought and paid for 5 gallons of gas. Alex Bridges bought a package of cigarettes. After these purchases were made William Graham drove the automobile away. A little after 8:00 a.m. Monroe heard William Graham and Alex Bridges had been killed.

On this Sunday morning about 8:00 o'clock Jesse Snead was driving an automobile on U. S. Highway 15 in the direction of Laurinburg. A grey Ford automobile passed him going toward Laurinburg at a speed of 70 to 75 miles an hour. Snead testified three colored men were in the front seat, and he also testified, "it was my presumption that three were on the front seat." Less than a minute later and about a mile down the road from where this grey Ford automobile passed him, Snead saw this grey Ford automobile turned over on the left hand side of the highway and three bodies scattered 25 to 30 feet apart—one on the shoulder of the highway near the automobile and two on the hard-surfaced part of the highway. William Graham and Alex Bridges were dead. John Graham, a large man of some 260 pounds in weight, was unconscious and "bleeding awful bad." One of the dead men was barefooted. Shoes were at the scene of the wreck. The automobile and three bodies were lying in the residential section of Laurinburg in front of J. E. King's home. At that place is a curve in the highway.

Between 8:00 and 8:15 o'clock this Sunday morning J. E. King was in his kitchen reading the morning paper. He heard a noise, looked and saw an automobile with both ends four feet off the ground. He testi-

fied: "It (the automobile) started leaving the highway between me and Mr. Ned McRae's, then it came on the curve and when it started back across the road, turning over." King went out to the wreck. He saw two men dead, and one unconscious, bleeding mighty bad, and gasping for breath. King saw tracks on the right hand shoulder for about 100 feet, and clear markings on the highway, when the automobile got back on the highway. One of the dead men was barefooted. A pair of shoes was on the highway.

H. C. Gardner, a police officer of Laurinburg, arrived at the scene of the wreck on U. S. Highway 15 at 8:25 a.m. It occurred about 100 yards within the town's corporate limits. He saw lying on the road and shoulder three men: two dead, one unconscious. One of the men was barefooted. He called an ambulance. He testified: "There were marks from the center of the curve down the right hand shoulder of the road where the car had traveled in a skid. The marks 138 feet from the center of the curve lead diagonally to the left side of the highway, and then marks for 60 feet down the left shoulder of the highway of a car in a skid and marks, 75 feet, where there was debris from the car where it had overturned. The car was on the left shoulder of the road, the front end pointing south and the rear north, lying on its left side. There was debris all along."

The bodies of William Graham and Alex Bridges were carried to the Morris Funeral Home. When the bodies arrived there, William Graham had on parachute boots, and Alex Bridges had on socks, but no shoes.

The wrecked automobile was put at the forks of a road as a warning to people during the Christmas season. Maggie Bridges, the plaintiff and widow of Alex Bridges, went to the automobile so placed, and found both of her husband's shoes in the back seat.

Defendant's evidence tended to show that plaintiff's intestate had been seen driving this Ford automobile on the night before the wreck, and on two occasions between 5:30 a.m. and 7:30 a.m. on 18 December 1955. Pres Johnson was William Graham's father-in-law. Tommy Lee Roper, a witness for defendant, said on cross-examination William Graham drove this grey Ford automobile like it was his, he had had it 2 or 3 months, he drove it to work. Dan Graham, uncle of William Graham, testified on cross-examination, William Graham kept this Ford automobile at his home, and had been driving it 2 or 3 months.

The evidence shows that John Graham was in the courtroom during the trial. Neither party saw fit to call him as a witness.

All the evidence tends to show that Alex Bridges was killed by the actionable negligence of the driver of the Ford automobile in driving it at an excessive speed in violation of G.S. 20-141, sub-sec. (b)4, and in a reckless manner in violation of G.S. 20-140.

The question for decision is whether plaintiff has sufficient evidence to carry the case to the jury that the automobile at the time it overturned was being driven by defendant's intestate William Graham.

It is familiar learning that when a motion for judgment of nonsuit is made, plaintiff is entitled to have his evidence considered in the light most favorable to him, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. *Atkins v. Transportation Co.,* 224 N.C. 688, 32 S.E. 2d 209. So much of defendant's evidence as is favorable to the plaintiff or tends to explain or make clear that which has been offered by the plaintiff may be considered, but that which tends to establish another and a different state of facts, or which tends to contradict or impeach plaintiff's evidence is to be disregarded. *Singletary v. Nixon,* 239 N.C. 634, 80 S.E. 2d 676; *Bundy v. Powell,* 229 N.C. 707, 51 S.E. 2d 307.

"Discrepancies and contradictions, even in plaintiff's evidence, are for the twelve and not for the court," *Barlow v. Bus Lines,* 229 N.C. 382, 49 S.E. 2d 793, and do not justify a nonsuit. *Keaton v. Taxi Co.,* 241 N.C. 589, 86 S.E. 2d 93.

Plaintiff did not offer any direct evidence showing that William Graham was driving the automobile at the time it overturned. She was not required to do so. Circumstantial evidence, either alone or in combination with direct evidence, is sufficient to establish this crucial fact. *Lane v. Bryan,* 246 N.C. 108, 97 S.E. 2d 411; *Whitson v. Frances,* 240 N.C. 733, 83 S.E. 2d 879; *Kelly v. Willis,* 238 N.C. 637, 78 S.E. 2d 711; *S. v. Sawyer,* 230 N.C. 713, 55 S.E. 2d 464; *Etheridge v. Etheridge,* 222 N.C. 616, 24 S.E. 2d 477; *S. v. King,* 219 N.C. 667, 14 S.E. 2d 803; *Hensley v. Helvenston,* 189 N.C. 636, 127 S.E. 625; *Limes v. Keller,* 365 Pa. 258, 74 A. 2d 131; *Huestis v. Lapham's Estate,* 113 Vt. 191, 32 A. 2d 115; *Shaughnessy v. Morrison,* 116 Conn. 661, 165 A. 553; *Shirley v. Shirley,* 261 Ala. 100, 73 So. 2d 77; 65 C.J.S., Negligence, pp. 1067-1071.

Plaintiff's evidence, and defendant's evidence favorable to her, considered in the light most favorable to her establishes these facts by clear and direct evidence: William Graham kept the Ford automobile that overturned killing him and Alex Bridges at his house, and had been driving it 2 or 3 months. He drove this automobile like it was his, he had had it 2 or 3 months, and drove it to work. About 5:00 p.m. on Saturday before the fatal wreck the next morning he drove it to John Graham's house, and drove it away. About 6:30 a.m. the day of the wreck he drove it again to John Graham's house. Alex Bridges was riding with him. He got John Graham and drove it away. A new motor had been put in the automobile. About 6:30 a.m. the morning of his death, he showed Webster McCall at his home how this motor

sounded off saying, "let me show you what I have under the hood of my car, want you to hear it sound off." Bridges and John Graham came to the McCall home with him and left with him. Between 7:00 and 8:00 a.m., and shortly before his death, he drove this automobile up to Ernest Monroe's filling station on U. S. Highway 15, stopped at the gas tank and bought 5 gallons of gas. When the automobile came up to this filling station, John Graham was in the front seat with him and Alex Bridges was lying on the back seat with his shoes off. He drove it away. This filling station was about 10 or 12 miles from Laurinburg. He had bought gas from Monroe several times. Monroe never saw anyone else driving this automobile. This automobile overturned on U. S. Highway 15 in the corporate limits of Laurinburg a short time thereafter. The dead body of Alex Bridges had no shoes on the feet. Later his widow found his shoes in the back seat of this automobile. The dead body of William Graham had on its feet parachute boots. The ultimate fact that William Graham was driving the automobile at the time it overturned can be reasonably inferred from these facts shown by direct evidence.

The court below properly overruled the defendant's motions for judgment of nonsuit, and submitted the case to the jury. In the trial below we find

No error.