Howard SPARKS, Administrator,
Plaintiff,

v.

SOUTHEASTERN GREYHOUND LINES
(The Greyhound Corporation),
Defendant.

Civ. No. 1135.

United States District Court
N. D. Mississippi, E. D.
June 5, 1959.

Cunningham & Cunningham, Booneville, Miss., Cary Stovall, Corinth, Miss., for plaintiff.

Lumpkin, Holland & Ray, Tupelo, Miss., Shepherd, Heiskell, Williams, Beal & Wall, Memphis, Tenn., for defendant.

CLAYTON, District Judge.

This is an action for damages under § 123, Title 7, Code of Alabama, 1940, arising from the death of Johnny A. Sparks, a single man 25 years' old. He died August 3, 1958, in an intersection collision between an automobile, occupied by Sparks and Charles Dickinson, and a bus operated by defendant. Plaintiff is administrator of the estate of Johnny A. Sparks. Defendant was designated as Southeastern Greyhound Lines in the complaint, but, as appears from the answer, its correct corporate title is The Greyhound Corporation. Plaintiff alleged that Dickinson was the driver of, and Sparks a guest in the automobile and that the collision was caused by the high speed of the bus and the failure of its driver to have the bus under control, to keep a proper lookout, to apply the brakes, to turn the bus away from the automobile and to sound the horn as the bus approached the intersection. Defendant denied any negligence of its bus driver and alleged that Sparks was the driver of the automobile, or chargeable with the actions of the driver thereof, and that the driver was guilty of all the negligence causing the collision consisting of high speed and failure to keep a lookout and failure to stop at a stop sign before entering the intersection. Counterclaim was filed for the damage to the bus on the allegation that Sparks was the driver of the automobile and that his negligence, as in the answer, caused the collision. Plaintiff answered in accord with the complaint and trial was had to the court.

1) The collision occurred in the intersection of U. S. Highway 78 and Alabama Highway 19. In this vicinity Highway 78 runs generally east and west and Highway 19 runs generally north and south. The intersection of these highways is almost at right angles. Defendant's bus was westbound on Highway 78, while the automobile was northbound. In approaching the intersection from the south the automobile was ascending a grade with about the same degree of slope for approximately 940 feet, rising in that distance, about 22 feet. The bus, coming from the east, at about 900 feet away from the intersection, was at the crest of a rise slightly higher than the intersection and as it approached the intersection, it went downhill to a point approximately 9 feet lower than the intersection. From this low point, about 500 feet east of the intersection, the bus ascended a grade of approximately uniform slope to the intersection.

2) In the southeast quadrant formed by this intersection the ground was higher than the surface of the intersection and higher than the surface of either highway approaching the intersection. This high ground was topped by trees and undergrowth. As shown by the photographs introduced, some of these trees, pine and oak, were more than 20 feet tall. At a point 50 feet south of the center line of Highway 78 and on Highway 19 this ground was about 8.2 feet above the surface of the highway. At a point 50 feet east of the center line of Highway 19 and on Highway 78, it was 7.2 feet above the roadway. This high ground and the growth thereon restricted seriously the visibility to the left, for a vehicle driver approaching on Highway 78 from the east, and to the right of such a driver, approaching from the south on Highway 19.

3) Both highways were surfaced with rough macadam asphalt for about 20 feet of width. Within the intersection this surfacing aproned out for a width of approximately 65 feet from edge to edge, northeast to southwest, and about 55 feet, northwest to southeast. The apron was further extended to the northeast by gravel to about 30 feet at its widest place and to the northwest in the same way by approximately 40 feet. To the southeast the gravel, extending the asphalt, was about 25 feet, at its widest, and to the southwest about 20 feet. In the northeast quadrant, slightly less than halfway from Highway 78 to Highway 19, a local gravel road about 20 feet in width ran to the northeast, from the gravel extension of the asphalt apron.

4) On Highway 78, more than 1100 feet east of the intersection, there was a sign showing that ahead there was a junction with Highway 19; 887 feet east there was a sign cautioning "Slow" and warning of the intersection; about 530 feet east there was a speed limit sign showing 40 miles per hour and warning of the intersection; about 320 feet east was a direction sign and about 125 feet east was a Highway 19, north-south sign.

5) On Highway 19, south of the intersection at about 900 feet was a sign showing a junction with Highway 78 ahead; about 720 feet was a sign cautioning "Slow" and warning that an intersection was ahead; at about 530 feet was an intersection and stop warning sign; about 300 feet there was a direction sign and about 30 feet south of the center line of Highway 78 was a "Stop" sign.

6) The point of impact between the automobile and bus was just north of the center-line of Highway 78 east of the center of Highway 19. Distinct marks, undulations, were made there by the front wheels of the automobile. The right front portion of the automobile and the left front corner of the bus collided. The bus left the highway to the northwest and came to rest about 185 feet from the point of impact. It made no mark off the highway for a distance of about 57 feet beyond the shoulder line, which was on a fill of approximately 10 feet at this place. It knocked down a tree about 6 inches in diameter, overturned and stopped against another tree. This was about 75 feet north of the center-line of Highway 78. After the collision, the bus was not considered repairable, but had some salvage value.

7) The demolished automobile left the highway to the southwest. Its motor was torn out and stopped about 87 feet from the point of impact and about 47 feet south of the center-line of Highway 78. The rest of the automobile came to rest about 47 feet west of the motor. Dickinson and Sparks were both killed. One body was about 111 feet west of the point of impact near the north edge of the asphalt of Highway 78. The other body was about 15 feet south of the wrecked automobile.

8) No witness was produced who could say which occupant of the automobile was the driver. The automobile belonged to the father of Charles Dickinson, who allowed his son to use it for his pleasure, but on condition that he allow no one else to drive it. Four witnesses

testified that when this automobile left a public gathering a short time before the collision, Dickinson was driving and Sparks was sitting beside him.

"When a fact continuous in its nature is proved to exist, its continuance may be presumed until the contrary is shown." Garner v. Green, 8 Ala. 96.

This seems to be a succinct statement of the applicable rule in most jurisdictions. 31 C.J.S. Evidence § 124, p. 736; 20 Am. Jur. 205. Thus, it may be presumed that Dickinson continued to drive the automobile until the collision. This presumption is further strengthened by the fact that the report submitted and signed by the two Highway Patrolmen identified the driver of the automobile as Dickinson and by witnesses for plaintiff who testified that it was the invariable custom of Dickinson to drive "his" automobile when he was using it and for Sparks to drive his, Sparks', automobile when he was riding in it. This was true when these two kinsmen were together. Objection was made to this evidence by defendant and ruling was reserved. This evidence was admissible and is considered by this court as circumstantial evidence tending to support the theory that Dickinson was the driver. Shirley v. Shirley, 261 Ala. 100, 73 So.2d 77; Bastian v. Baltimore & O. R. Co., 3 Cir., 144 F.2d 120; Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So. 2d 389; Bridges v. Graham, 246 N.C. 371, 98 S.E.2d 492; Stegall v. Sledge, 247 N.C. 718, 102 S.E.2d 115; Moore v. Watkins, Tenn.App., 1956, 293 S.W.2d 185 and Robinson v. Workman, 9 Ill.2d 420, 137 N.E.2d 804. See also Rodney v. Staman, 371 Pa. 1, 89 A.2d 313, 32 A.L.R. 2d 976 and the note following that case.

9) Four witnesses who knew Dickinson and Sparks identified the body found near the north edge of Highway 78 as the body of Sparks. Sparks had red hair, Dickinson had dark hair. Some particles of red hair were found on the right door opening of the wrecked automobile. Identification of these bodies, at the undertakers, some time after the collision, by an Alabama Highway Patrolman seems just the reverse. But, his testimony is based on hearsay or is in fact hearsay, as it bears on the identity of the bodies, and this was after the bodies had been removed and transported by two different people in two different ambulances. Such doubt as may thereby be raised is insufficient, when all of the circumstances are considered, to forestall the finding of fact that Dickinson was driving and Sparks was a guest in the automobile.

10) It is uncontradicted that the automobile failed to stop for the "Stop" sign at the south entrance to this intersection. It laid down skid marks about 35 feet in length. These began just south of the "Stop" sign and ended at the point of impact, about 2 feet north of the center-line of Highway 78. Its speed was variously fixed from 30 to 40 miles per hour, to, as one witness said, "terrific". From the skid marks and testimony it seems clear that this automobile entered the intersection at a speed no less than 40 miles per hour. The driver of this automobile was negligent. But, *there is no evidence which tends to show that Sparks, at any time, had knowledge of facts which were sufficient to charge him with the duty to anticipate that Dickinson would be reckless or negligent.* Thus, the negligence of Dickinson cannot be imputed to Sparks. Johnson v. Battles, 255 Ala. 624, 52 So. 2d 702; Hamilton v. Browning, 257 Ala. 72, 57 So.2d 530 and cases there cited.

In Johnson, the court said [255 Ala. 624, 52 So.2d 707]:

"* * * It is contended, however, that Kizziah, the driver of the automobile in which intestate was riding as a passenger, was guilty of negligence which proximately caused the injuries and that, therefore, plaintiff is not entitled to recover.

"But Kizziah's negligence, if any, could not bar a recovery by plaintiff unless his negligence was imputable to plaintiff's intestate. *It is a commonplace of the law that ordinarily a passenger in an automobile driven*

*by another, over whom he has no control, is not, on that state of fact, without more, chargeable with contributory negligence.* St. Louis-San Francisco R. Co. v. Norwood, 222 Ala. 464, 133 So. 27; Birmingham Electric Co. v. Turner, 241 Ala. 66, 1 So.2d 299; Moore v. Cruit, 238 Ala. 414, 191 So. 252; Roberts v. Louisville & N. R. Co., 237 Ala. 267, 186 So. 457; Morgan Hill Paving Co. v. Fonville, 218 Ala. 566, 119 So. 610; Id., 222 Ala. 120, 130 So. 807; Id., 224 Ala. 383, 140 So. 575; Newell Contracting Co. v. Berry, 223 Ala. 109, 134 So. 870; Strickland v. Davis, 221 Ala. 247, 128 So. 233. (Emphasis supplied.)

\* \* \* \* \*

"The rule is well established that in order to create the imputation of negligence of the driver to the passenger, the passenger must have assumed control and direction of the vehicle or must have some right to a voice in the control, management or direction of the vehicle. 65 C.J.S. Negligence, § 168, pages 822–825; Crescent Motor Co. v. Stone, 211 Ala. 516, 101 So. 49.

"We are inclined to agree with the assertion made by counsel for appellant that the great weight of the evidence shows that the car driven by Kizziah had proceeded from the eastern side of the highway toward the western side and was partly on the western side of the highway at the time of the impact. But even if it be assumed that such act on the part of Kizziah was negligent, it does not follow that the plaintiff was not entitled to recover under the evidence in this case, since any negligence of Kizziah cannot be imputed to plaintiff's intestate."

In Hamilton, it was said [257 Ala. 72, 57 So.2d 534]:

"Appellant asserts in brief: 'The appellee was guilty of contributory negligence for riding with Adams knowing at the time that he had been drinking and that she assumed such risks as were involved in voluntarily riding with him.' In the very recent case of King v. Brindley, supra [255 Ala. 425, 51 So.2d 870], is a restatement of the rule to the effect that one riding in an automobile driven by another, even though not chargeable with the driver's negligence, is not absolved from all personal care for his own safety, but is under the duty of exercising reasonable or ordinary care to avoid injury; that is, such care as an ordinarily prudent person would exercise under like circumstances. After citing a number of our cases so holding, Chief Justice Livingston, writing for the court, said:

" 'Some of the cited cases are suits by the passenger against third persons, others by the passenger against the driver or owner of the vehicle in which the passenger or guest was riding. But as said in the case of McGeever v. O'Byrne, supra (203 Ala. 266, 82 So. 508): "it can make no difference in principle whether the suit is against a third person, or against him who negligently operates the car; and the duty of the passenger to observe due care under the circumstances for his own safety must be the same in either case."

" 'And in speaking of the duty to use due care on the part of the guest or passenger it was held in the case of Birmingham Ry., Light & Power Co. v. Barranco, supra (203 Ala. 639, 84 So. (839) 842):

" ' "The duty is therefore not original with respect to the operation of the vehicle, but resultant, and that only from known and appreciated circumstances capable of bringing it into effect \* \* \* no fixed rule applicable to all cases can be formulated by which to determine when the duty stated arises or what particular circumstances raise the duty, or what particular warning, protest, or action will suffice to mani-

fest a discharge of the duty once it has arisen."

" ' "The ingredients of contributory negligence do not differ in any respect from those of primary negligence; it is after all 'like primary negligence, relative and not absolute, and being relative it is dependent on the peculiar circumstances of each particular case.' " McDermott v. Sibert, supra (218 Ala. 670, 119 So. (681) 684).

" 'It was said in Proctor v. Coffey [227 Ala. 318, 149 So. 838], supra: *We do not think that the authorities support the claim that a mere opportunity to know the danger is sufficient in the absence of facts suggesting to the guest as a person of ordinary care a necessity to keep a watch.* That is what was held in the case of Baker v. Baker, supra (220 Ala. 201, 124 So. 740). So in the case of B.(irmingham) R.(y) L.(ight) & P.(ower) Co. v. Barranco, supra, the duty of the guest is said to arise when he should anticipate that the driver of the vehicle will enter the sphere of danger or omit to exercise due care, *not when he has the opportunity to so anticipate without anything to direct his attention to such condition.* This principle is also mentioned in McGeever v. O'Byrne, supra; Dwight Mfg. Co. v. Word, 200 Ala. 221(14), 75 So. 979." (227 Ala. 318, 149 So. (838) 840). (Emphasis supplied.)

" 'And in Morgan Hill Paving Co. v. Fonville, 218 Ala. 566, 119 So. 610, 619: "That is, there is no duty on the guest, in the absence of *"knowledge of facts charging him with that duty, to anticipate that a driver will be negligent, reckless, or incompetent'* in the operation of the car and in keeping a proper lookout." ' 255 Ala. 428–429, 51 So.2d 873." (Emphasis supplied.)

11) What of the bus driver? He admitted that he did not see the automobile and that the first he knew of it was a "bump to the front of the bus". He was familiar with this route and this intersection and said that he was in an "almost total blind spot" as he approached Highway 19. But, he did not blow either the electric or air horn, with which this Scenicruiser bus was equipped, as he came up the hill to the point of impact. He said the speed of the bus was about 40 miles per hour. The driver of a second bus, on the same run and schedule as the one involved, following at "about two bus lengths" said his bus was traveling 45 miles per hour and "catching up" with the lead bus. Three passengers from each of these two busses testified with respect to the speed of the lead bus. Three fixed the speed at 40 to 45 miles per hour; one said it was "normal"; one said it was "reasonable—not fast" and the other varied from 40 to 60 miles per hour. Four witnesses for plaintiff, who testified that they followed the busses until the collision, fixed the speed as high as 80 miles per hour. This evidence of excessive speed gains corroboration from the great force of the impact as exemplified by the damage to the automobile and bus and the distance and direction of movement of each after the collision and by the fact that both occupants of the automobile were thrown out and the motor was torn loose completely. Blashfield, Cyclopedia of Automobile Law and Practice, Vol. 10, Section 6559, page 578. It is inconceivable that the bus was moving at only 40 miles per hour. Logic compels a finding that it was going substantially faster.

■ 12) One of defendant's witnesses testified that all its busses were governed so as to be incapable of exceeding a speed of 61.5 miles per hour. In rebuttal plaintiff offered a Mississippi Highway Patrolman who testified that he had checked, with accurate radar equipment, other busses of defendant on this same route, at speeds in excess of 65 miles per hour. On objection, made to this evidence, ruling was reserved. Plaintiff urges its consideration under the authority of Ward v. Ft. Smith Light & Trac-

tion Company, 123 Ark. 548, 185 S.W. 1085 and Briggs v. Chicago Great Western Railway Company, 248 Minn. 418, 80 N.W.2d 625. In Ward, evidence of speed of other street cars, at other times and places was excluded, but an intimation by way of dicta was to the effect that such evidence, predicated as it is here on defendants showing that all its busses were governed alike, *might* be admissible. In Briggs, rebuttal testimony by a witness who had actually assumed a position, claimed to have been occupied by plaintiff, testified as being impossible by defendant's expert, was admitted. Neither of these cases are helpful here. More persuasive, if not controlling, are the cases of Yazoo & M. R. Company v. Pittman, 169 Miss. 667, 153 So. 382; Tribette v. Illinois Central R. Company, 71 Miss. 212, 13 So. 899; Mississippi Central R. Co. v. Miller, 40 Miss. 45; and Southern R. Company v. Kendrick, 40 Miss. 374. See also Melville v. Greyhound Corporation, 99 Ohio App. 411, 133 N.E.2d 436; Powell v. Horne, 149 Fla. 240, 5 So.2d 451 and 20 Am.Jur., Evidence, § 302, p. 278. It is considered, especially in view of the fact that the witness could not fix the times when the incidents occurred, that the objection is well taken. Hence, this evidence is excluded from consideration.

13) Clearly the bus was exceeding the posted speed of forty miles per hour. Thus the driver may have forfeited any right of way he had through this intersection. Brown v. Standard Casket Mfg. Co., 234 Ala. 512, 175 So. 358; § 18, Title 36, Code of Alabama, 1940. It is clear also that this driver could not have had "during the last fifty feet of his approach" to this intersection a "clear and uninterrupted view" of traffic from the south upon Highway 19 "for a distance of two hundred feet from such intersection". § 5, Title 36, Code of Alabama, 1940. This statute may have required a greatly reduced speed for the approach to and entrance into this intersection. But, even if the view to the left had been clear and the speed reduced, it would not have helped the driver since *he was not looking to the left at all.* He never saw the automobile. It is probable, if the driver had been exercising due care in looking to the south on Highway 19, that he could have safely turned the bus to the right onto the wide asphalt and gravel apron and thus avoid the collision. Common prudence, due care or reasonable care, whatever it is called, demanded, coming up out of defilade, approaching the intersection in an "almost total blind spot", as he described it, that the bus driver give warning of the approach of his vehicle. This he did not do, although he knew that this was a "dangerous" intersection. Again, it appears probable that a prompt application of the brakes of the bus, if the driver had been reasonably alert, and if he had approached at a reasonably safe speed, would have sufficed to avoid this violent collision.

14) From what has been said it follows that the death of plaintiff's decedent was caused by the "wrongful act, omission, or negligence" of the bus driver (§ 123, Title 7, Code of Ala.1940), and that the defendant is liable therefor. But, the damages recoverable under this section are punitive as distinguished from actual or compensatory damages. Hampton v. Roberson, 231 Ala. 55, 163 So. 644. The amount of the recovery must be by reference alone to the quality of the wrongful act and the degree of culpability. Louisville & N. H. R. Co. v. Perkins, 1 Ala.App. 376, 56 So. 105; Southern Railway Co. v. Jarvis, 266 Ala. 440, 97 So.2d 549. Considering the degree of culpability of the bus driver the amount to be awarded to plaintiff as damages is fixed and hereby assessed at $20,000.

15) It follows that the counterclaim must fail and will be dismissed.

Order will be entered accordingly.