IN RE DRAINAGE OF AHOSKIE CREEK AND ITS TRIBUTARIES, WHITE OAK SWAMP, KNEE BRANCH, TURKEY CREEK, FORT BRANCH, TURKEY BRANCH, MILL BRANCH, PEGGY BRANCH, OTHER TRIBUTARIES, AND LANDS ADJACENT THERETO.

(Filed 15 June 1962.)

**1. Appeal and Error § 19—**

In grouping his exceptions, appellant should use language indicating that the matters or things referred to in the exceptions so grouped are assigned as error.

**2. Appeal and Error § 1—**

Where, the trial in the lower court is predicated upon the drainage district in question being an improvement district, appellant will not be allowed on his appeal to change his position and assert error on the ground that the district was a reclamation district and not an improve-

ment district, since the appeal, *ex necessitate*, must follow the theory of trial in the lower court.

3. **Drainage § 6—**

Petitioners' evidence together with as much of respondents' evidence not in conflict therewith but which tends to clarify or explain petitioners' evidence, *is held* to constitute affirmative and substantial evidence that the drainage proposed by the drainage district in suit would benefit the lands of respondents, and therefore respondents' motion of nonsuit on the ground of lack of sufficient evidence on this aspect was properly denied.

4. **Appeal and Error § 19—**

In grouping exceptions to the charge and to the exclusion of evidence and to the submission of the issues, the purported assignments of error should definitely and clearly present the errors relied on without going beyond the assignments of error themselves, and when this is not done the Supreme Court will not embark "on a voyage of discovery" through the record to ascertain what the purported assignments involve.

5. **Trial § 40—**

The issues are sufficient when they present to the jury proper inquiries as to all the determinative issues of fact in dispute and afford the parties opportunity to introduce all pertinent evidence and to apply it fairly.

SHARP, J., took no part in the consideration or decision of this case.

APPEAL by respondents North Carolina Pulp Company and Weyerhaeuser Company from *Paul, J.*, November 1961 Term of BERTIE.

On 8 January 1960, pursuant to G.S. 156-56, a petition signed by a majority (455) of the resident landowners in a proposed drainage district and by the owners of three-fifths of all the land which will be affected or assessed for the expense of the proposed improvements was filed in the office of the clerk of the superior court of Bertie County, in which a part of the lands is located, setting forth substantially the information required by the statute. The petition, *inter alia*, alleged: That the area of land described in the petition contains about 66,000 acres. That by reason of said improper and insufficient drainage water accumulates in low places and becomes stagnant and provides places for malarial mosquitoes to breed, and said condition creates a generally unhealthy condition in the community and affects injuriously the general health of the people residing in the community, and that the public benefit in the public health, convenience, and welfare will be promoted by draining, ditching, or leveeing the same, or by changing or improving the natural water course. That the drainage of the area described will result in the improvement and proper drainage of the lands already under cultivation, and that the

benefits from drainage will largely exceed the costs thereof. That in this area by reason of insufficient drainage surface water in large quantities accumulates both in the swamps and on the high lands decreasing the productivity of the soil and causing the crops grown thereon to be of inferior quality. Pursuant to G.S. 156-57, bond was filed and summons issued. Counsel for petitioners and counsel for respondents stipulated that the petition was signed by more than a majority of the resident landowners of the proposed drainage district representing more than three-fifths of the land area adjudged to be benefited, that summonses were issued and served against other landowners not parties to the petition, particularly North Carolina Pulp Company.

Pursuant to G.S. 156-59, the clerk of the superior court of Bertie County on 11 April 1960 by order appointed a board of viewers. On 19 May 1960, pursuant to G.S. 156-62, the board of viewers filed a preliminary report with the clerk of the superior court of Bertie County. In their report they stated about 18,000 acres of land in the area set forth in the petition should be eliminated from the proposed drainage district, and about 48,000 acres of land in the area should compose the drainage district, and the map they filed with the report showed the boundaries of the about 48,000 acres. They reported to the court:

"1. That the proposed drainage is practical.

"2. That it will benefit the public health, public highways, and will be conducive to the general welfare of the community through which it passes.

"3. That the proposed drainage canal will benefit the lands sought to be benefited and the health of the people living and working thereon.

"4. As nearly as we can ascertain by preliminary examination all of the lands that will be benefited by such drainage are included within the proposed drainage district, the boundary of which is shown on the attached map.

"5. That the proper drainage district will be an improvement district under the definition given in Section 156-62 of the North Carolina Code of 1943 as amended."

Pursuant to G.S. 156-63, there was a first hearing of the preliminary report of the board of viewers by the clerk of the superior court of Bertie County on 19 May 1960. Then, pursuant to G.S. 156-64, notice was given of a further hearing, which was held on 3 June 1960. On 9 February 1961, the clerk of the superior court of Bertie County, pursuant to the jurisdiction, power, and authority vested in him by

G.S. Chapter 156, Drainage, subchapter III, Article 5, had another hearing on the preliminary report of the board of viewers, and entered an order setting forth basically the preliminary report of the board of viewers, finding that the boundaries as shown on the map filed with the preliminary report of the board of viewers include all the lands that will be benefited by the establishment of the drainage district, that a majority of the resident landowners and/or the owners of 60% of the area within the boundaries of the proposed drainage district have petitioned the court for the creation of the drainage district, and decreeing the creation and establishment of the Bertie, Hertford, Northampton Drainage District No. 1. The clerk's order referred the report back to the board of viewers to make a complete survey, plans, and specifications for the drains and other improvements, in conformity with G.S. 156-69, nature of the survey, G.S. 156-70, assessment of damages, and G.S. 156-71, classification of lands. Up to this point it seems there had been no objection by anyone to the proceeding.

On 8 May 1961, service of summons in this proceeding was had on the North Carolina Pulp Company. On 17 May 1961, North Carolina Pulp Company and Weyerhaeuser Company filed an answer alleging in substance as follows: Of the lands owned by respondents in the drainage district only 50 acres will receive any benefit from the drainage project. That all their land in the district is swamp or woodland, and that actually some of their lands sought to be drained will be in jeopardy of destruction by fire.

On 20 June 1961, the board of viewers, pursuant to G.S. 156-73, filed their final report with the clerk of the superior court of Bertie County. In this report, pursuant to G.S. 156-71, their classification of land was as follows: That receiving the highest benefit "Class A"; that receiving the next highest benefit "Class B"; next "Class C"; next "Class D"; and that receiving the least benefit "Class E." In the report all the tracts of land belonging to North Carolina Pulp Company were classified as follows:

|        | Tract No. | Class A | Class B | Class C | Class D | Class E | Total |
|--------|-----------|---------|---------|---------|---------|---------|-------|
| (F-5)  | 181       |         | 30      | 4       | 228     |         | 262   |
| (I-5)  | 273       |         | 52      | 18      | 411     | 215     | 696   |
| (F-6)  | 545       |         |         | 23      |         | 58      | 81    |
| (F-6)  | 549       |         |         |         |         | 67      | 67    |
| (F-6)  | 551       |         |         |         |         | 53      | 53    |

The report further stated all the lands within the district will be benefited, with an exception apparently not relevant on this appeal, and that this is an improvement district as defined by G.S. 156-62.

Respondents filed exceptions to the classification of their lands in the final report of the board of viewers as follows: As to tract No. 181 they do not challenge the 30 acres classified as "B", but challenge the classification of the remaining acres of this tract. As to tracts Nos. 273 and 545 they challenge the entire classification. As to tracts Nos. 549 and 551 they do not challenge the classification.

On 31 August 1961, the clerk of the superior court of Bertie County entered a judgment finding as a fact that the board of viewers classified all the lands in the drainage district fairly and equitably, and that no evidence was offered by respondents tending to show otherwise, concluding that the board of viewers had offered substantial and competent evidence supporting their findings that the lands of respondents will be benefited by the proposed drainage improvements within the drainage district, and confirming the final report of the board of viewers. From which judgment respondents appealed to the superior court.

At the September 1961 Term of the superior court of Bertie County, Judge Paul presiding remanded the proceeding to the clerk of the superior court of Bertie County directing him to enter an order commanding the board of viewers to go upon respondents' tracts of land Nos. 181, 273, and 545, and report to him in writing their findings as to how these three tracts of land will be benefited by the completion of the drainage district, if benefited at all. The order further provided that the clerk should have a hearing upon any exceptions filed by respondents to the report. On 11 September 1961, the clerk entered an order as directed by Judge Paul.

On 30 October 1961, the board of viewers filed with the clerk of the superior court of Bertie County their report, which is set forth in more than 15 pages in the record, stating with great particularity and minuteness the benefits respondents' tracts of land Nos. 181, 273, and 545 will receive from the aforesaid drainage district. Respondents filed exceptions to this report, which cover over 12 pages in the record. Their exceptions are almost completely argumentative. On 9 November 1961, the clerk of the superior court of Bertie County entered judgment approving and confirming the report of the board of viewers. Respondents appealed to the superior court.

At the November 1961 Term the appeal came on to be heard before Judge Paul and a jury.

The jury found by its verdict to this effect: That respondents' tracts of land Nos. 181, 273, and 545 will be benefited by the drainage project of Bertie, Hertford, Northampton Drainage District No. 1.

The judge entered a judgment decreeing and adjudging that respondents' tracts of land Nos. 181, 273, and 545 will be benefited by

the drainage project of Bertie, Hertford, Northampton Drainage District No. 1, that the report of the board of viewers and the order of the clerk of the superior court of Bertie County as the same relates to and adjudges that respondents' above-described lands will be benefited is approved and confirmed, and that respondents' exceptions to said report and order of the Clerk with respect to said benefits to the above-described lands be, and hereby are, overruled.

From this judgment, respondents appeal to the Supreme Court.

*Norman & Rodman and Pritchett & Cooke for respondent appellants.*

*Stuart A. Curtis, Frank M. Wooten, Jr., and David E. Reid, Jr., for petitioner appellees.*

PARKER, J. Respondents in the record have a grouping of their exceptions at the end of the charge to the jury, and before the judgment and appeal entries, but the grouping of their exceptions contains no language that they assign the matters or things referred to in their exceptions as error.

However, we will discuss their exception to the denial by the court of their motion for judgment of involuntary nonsuit made at the close of all the evidence. G.S. 1-183.

Respondents first contend that their motion for nonsuit should have been allowed for the reason that all the evidence shows that the Bertie, Hertford, Northampton Drainage District No. 1 is an improvement district as defined by G.S. 156-62, 5, but that so far as their lands in the district are concerned it is a reclamation district. They contend second their motion should have been allowed for the reason that there is no affirmative evidence that the drainage district will benefit their lands therein.

The first contention is without merit. The preliminary report of the board of viewers states that the drainage district will be an improvement district, and the clerk's order decreeing the establishment of Bertie, Hertford, Northampton Drainage District No. 1 states it is an improvement district. The record shows that during the trial before Judge Paul and the jury petitioners and respondents entered into a stipulation "that the Drainage District contains the lands of Weyerhaeuser Company and North Carolina Pulp Co., is an improvement district as described in the statute." G.S. 156-71 authorized the engineer and board of viewers to personally examine the land in the drainage district, and classify it with reference to the benefit it will receive from the construction of the drainage district. They were authorized by the statute to classify the land benefited in five classes. The land receiv-

ing the highest benefit to be marked "Class A"; that receiving the next highest benefit "Class B"; that receiving the next highest benefit "Class C"; that receiving the next highest benefit "Class D"; and that receiving the smallest benefit "Class E." As to respondents' tract of land No. 181, 30 acres were classified as "Class B," 4 acres as "Class C," and 228 acres as "Class D," as set forth in the final report of the board of viewers filed with the clerk of the superior court of Bertie County on 20 June 1961. In respondents' exceptions filed to the classification of their lands, they did not challenge the classification of 30 acres of tract No. 181 as "Class B." In the same report respondents' tracts of land Nos. 549 and 551 were both classified as "Class E," and respondents in their exceptions to the final report did not challenge the classification of these two tracts of land.

It seems manifest that respondents elected to try their case in the lower court on the theory that Bertie, Hertford, Northampton Drainage District No. 1 was an improvement district in respect to all their lands in the district, and now they want to change their attitude with respect thereto on appeal, and contend that so far as their lands in the drainage district are concerned it is a reclamation district. Such a change of position with respect to a material point between the trial and the Supreme Court will not be permitted. The appeal, *ex necessitate,* must follow the theory of the trial in the court below. *Lyda v. Marion,* 239 N.C. 265, 79 S.E. 2d 726; *Leggett v. College,* 234 N.C. 595, 68 S.E. 2d 263; *Hargett v. Lee,* 206 N.C. 536, 174 S.E. 498.

It is expressly provided by G.S. 156-65 that if the court shall determine that there is any land included in a proposed drainage district, established thereunder, that will not be benefited by the establishment of the district, such land shall be excluded from the drainage district.

In *O'Neal v. Mann,* 193 N.C. 153, 161, 136 S.E. 379, 383, it is said: "Only lands which are benefited are subject to assessments; but all lands included in the district, which are benefited, are subject to assessments, the amount of the assessment upon the land of each owner being determined by the benefit which the said land receives."

Evidence offered by Bertie, Hertford, Northampton Drainage District No. 1 tends to show that on all of respondents' tracts of land Nos. 181, 273, and 545, there is some growing timber, and no farm crops, and that respondents are engaged in the business of growing timber. C. R. Friddle, who works for the Soil Conservation Unit Service of Hertford County, a witness for the drainage district, testified on cross-examination: "I saw Coxville soil on each tract [tracts 181, 273, and 545]. It is adapted to the growing of timber *when properly drained.*" Emphasis ours. Joe Covington, found by the court, without objection, to be an expert scientist in the classification of soils, testified

for the drainage district: "Coxville silt loam is the dominant on all three tracts of 273, 181, and 545. It is a poorly drained soil."

## TRACT NO. 181

This tract of land is composed of 262 acres, is located on the road from Aulander to Rich Square, and is classified as follows: 30 acres "Class B," 4 acres "Class C," and 228 acres "Class D," by the board of viewers in their report filed 20 June 1961. Respondents do not challenge this classification of the 30 acres as "Class B." In respondents' exceptions to the classification of their lands in the final report of the board of viewers on 20 June 1961 they stated: "As to the 30 acres in Class B, this classification is not challenged." In respondents' exceptions to the report of the board of viewers filed with the clerk on 30 October 1961 it is stated: "These respondents admit that approximately 35 acres of this Tract No. 181 will receive some trace of benefit if the lateral entering the east end of said land along an old ditch is constructed." In these exceptions respondents further state in effect that the said 35 acres is not sufficiently drained. This tract is a pocosin type land. The only ditch on it of any consequence is very much clogged up. Much of the area is full of reeds. One of the proposed laterals of the drainage district will go up the ditch about 1500 feet. The natural drainage of this tract is in the direction of this proposed lateral. Water was found standing in the ditch and in ruts on the back of the tract. The few drainage outlets were clogged up, and unable to take care of drainage in a normal manner. Coxville silt loam is dominant on this tract, which is identified as poorly drained. Thomas W. Rivers, held by the court, without objection, to be an expert civil engineer specializing in drainage, testified for the drainage district: "In the vicinity of that ditch, and on either side, there is a large area that was covered with weeds, reeds, brambles; there were numerous tall dead snags where trees had died, and it was all quite flat. In that particular area there was on the back of the tract a growth of timber, of pines, quite a lot of reeds. * * * There is a cleared area that leads away from these road ditches and in which when I was there we found quite a lot of; a large accumulation of water, debris, and collection of materials that you get when water runs off of surface areas." William S. Grimes of the Hertford County Health Department testified for petitioners that when he went on Tract 181 he found mosquito larvae there.

## TRACT NO. 273

This tract of land consists of 696 acres which are classified as follows: 52 acres "Class B," 18 acres "Class C," 411 acres "Class D," and 215 acres "Class E," by the board of viewers in their report filed

20 June 1961. On this area was a mill pond consisting of 20 or 30 acres. It has two natural drainage ditches, both of which were badly clogged with logs, debris, and brush of all types. There were water marks on the trees 16 to 18 inches high from the ground for a considerable distance on both sides of the proposed lateral that will come to the ditch. On both sides of the proposed lateral water has washed across the road. Water drains from this in the direction of the proposed lateral. When it had not rained in the general area for three or four weeks water was seen standing in spots, and the land around the ditches that led to the old mill pond was generally wet. This tract is of a rolling type with its outer edges at a higher level than the old mill pond section. It borders a paved highway between Aulander and Ahoskie. This tract is covered pretty thoroughly with growing timber. The soil appears to be quite thick, plastic, and generally impermeable to water.

### TRACT NO. 545.

This tract consists of 81 acres, and is classified by the board of viewers in their report filed 20 June 1961 as follows: 23 acres "Class C," and 58 acres "Class E." This tract of land is of a pocosin type, is flat, and has no drainage whatever. It had been burned over. Some type of equipment had been used to break up the land. There is an old ditch on the back side pretty well clogged up. Herbert Jenkins, Jr., testified for the drainage district:

> "I know that some of Tract 545 has been used for row crop cultivation. How often and how long duration these periods the water will stand on 545 would depend on what kind of year we have. With a fall like the one we have just had, you could not find water standing there except in the ruts on Tract 545 but in a normal year there were a very few times you could go on this tract without finding some water standing. * * *
>
> "* * * All of the water on tract 545 goes into this ditch, the proposed lateral."

Thomas W. Rivers, whose qualification as an expert witness is set forth above, testified for the drainage district as to tract No. 545 on direct examination:

> "The terrain of that tract is quite flat, it is a pocosin. There is no assured surplus drainage outlet. That is the course the water will follow. The land is so flat it has to follow anything it can get into. The lateral ditch along the roadway is the nearest thing to a drainage outlet."

J. V. Hofman, admitted by the parties to be an expert in forestry, testified for the respondents on cross-examination:

"* * * Trees must have air for growth, and in order to get air the water cannot stand stagnant on the ground. It must be moved off. It is very dangerous for water to stand for more than two to three weeks at a time without being drained off. It keeps the air from getting to the trees. The sub-surface water should not be affected by the drainage. The important thing is getting the water off the top of the land so that the trees can get the air they need to grow."

Respondents offered evidence tending to show that these three tracts of land have sufficient natural drainage for the growth of timber thereon, and that the drainage of these tracts of land, if included in the drainage district, may be a detriment to the growing of timber on certain parts of these tracts.

It is our opinion, and we so hold, that considering the evidence offered by the drainage district in the light most favorable to it, and considering so much of respondents' evidence as is favorable to the drainage district, or tends to clarify or explain evidence offered by the drainage district not inconsistent therewith, as we must do in passing on a motion for judgment of involuntary nonsuit, *Bridges v. Graham,* 246 N.C. 371, 98 S.E. 2d 492; *Watters v. Parrish,* 252 N.C. 787, 115 S.E. 2d 1, it permits a finding by a jury of the following facts and legitimate inferences: That all three tracts of land, or most of all these three tracts, do not have sufficient natural drainage, or any other drainage, to prevent surface water from standing on the ground, that Coxville silt loam is the dominant on all three tracts, that each tract has Coxville soil, and that such soil is adapted to the growing of timber, *when properly drained,* that trees must have air for growth, and in order to get air the water cannot stand stagnant on the ground, it must be moved off, that it is very dangerous for water to stand for more than two to three weeks at a time without being drained off, because it keeps the air that trees need to grow from getting to the trees, that the sub-surface water on these tracts should not be affected by the drainage district, and that all three tracts of land, Nos. 181, 273, and 545, will be benefited for the growing of trees by being included in and receiving the benefits of the drainage district, in that the surface water will be drained off so that the trees will have air for growth. The conflicting evidence of the parties presented a case for the jury, and the court properly denied respondents' motion for judgment of compulsory nonsuit made at the close of all the evidence.

Respondents' grouping of exceptions to the charge—there are no assignments of error—is: "GROUP 'F'. Exception No. 11 (R p 174), Exception No. 12 (R p 175) are to the charge of the court. Exception

No. 13 (R p 178), Exception No. 14 (R p 179), Exception No. 15 (R p 180), are to the charge of the court." These exceptions to the charge are overruled. This Court speaking by *Higgins, J.* said in *Nichols v. McFarland,* 249 N.C. 125, 105 S.E. 2d 294:

> "Rule 19(3), Rules of Practice in the Supreme Court, 221 N.C. 554, 555, as interpreted in the decisions of this Court, require: 'Always the very error relied upon shall be definitely and clearly presented, and the Court not compelled to go beyond the assignment itself to learn what the question is.' *State v. Mills,* 244 N.C. 487, 94 S.E. 2d 324; *Allen v. Allen,* 244 N.C. 446, 94 S.E. 2d 325; *Parsons v. Benfield,* 228 N.C. 651, 46 S.E. 2d 829; *Porter v. Lumber Co.,* 164 N.C. 396, 80 S.E. 443; *Thompson v. R. R.,* 147 N.C. 412, 61 S.E. 286. The objectionable assignments in their present form would require the Court to undertake a voyage of discovery through the record to ascertain what the assignments involve. This the Court will not do. *Cecil v. Lumber Co.,* 197 N.C. 81, 147 S.E. 735."

Respondents' grouping of exceptions to the exclusion of evidence is: "GROUP 'B'. Exception No. 2 (R p 132); Exception No. 3 (R p 132); Exception No. 4 (R p 133); Exception No. 5 (R p 134) are to the ruling of the court excluding evidence of respondents." These exceptions are overruled for the Court will not embark "on a voyage of discovery."

Respondents' grouping of exceptions Group "D" is: "Exception No. 8 (R p 149); Exception No. 9 (R p 149), are to the refusal of the court to charge the jury according to the prayers tendered by the respondents." These exceptions are overruled, for the reason above stated.

Respondents group exceptions to the submission of the issues to the jury, and to the recital of the issues to the jury in its charge. These exceptions are overruled. Respondents tendered no issues. To find the issues and the recital of the issues in the charge we must go "on a voyage of discovery" beyond the grouping of exceptions. However, the issues submitted by the court were sufficient, because they presented to the jury proper inquiries as to all the determinative issues of fact in dispute, and afforded the parties opportunity to introduce all pertinent evidence and to apply it fairly. G.S. 156-66; G.S. 156-75; *Shelton v. White,* 163 N.C. 90, 79 S.E. 427; *Cherry v. Andrews,* 231 N.C. 261, 56 S.E. 2d 703; Strong's N. C. Index, Vol. 4, Trial, sec. 40. In respondents' brief their only statement to the submission of the issues is "on the same grounds that support our contentions for judgment as of nonsuit."

The other grouping of exceptions by respondent is to the refusal of the court to set the verdict aside, and to the signing and entry of the judgment. These exceptions are overruled.

In the trial below we find

No error.

SHARP, J., took no part in the consideration or decision of this case.