HOWARD I. HUESTIS, ADMR. ESTATE OF ROJEANNE R. HUESTIS
*v.* ESTATE OF HORACE J. LAPHAM.

February Term, 1943.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and
JEFFORDS, JJ.

Opinion filed May 4, 1943.

*A. Pearley Feen* and *Wayne C. Bosworth* for the defendant.

*Harold I. O'Brien* and *Lindley S. Squires* for the plaintiff.

SHERBURNE, J. This is an appeal to the county court from the disallowance by the commissioners upon the defendant estate of a claim arising out of an automobile accident, in which the plaintiff's intestate, Mrs. Huestis, a guest passenger, was drowned. The declaration charges that the accident resulted from the gross and wilful negligence of Mr. Lapham in the operation of his automobile. Verdict and judgment were for the plaintiff and the defendant has excepted. The only exceptions briefed relate to the denial of defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

The evidence viewed most favorably to the plaintiff reasonably tended to show the following facts: Mr. Lapham, Charles Finn, Lewis Hanfield and Mrs. Huestis were neighbors and resided in Bridport on or near the easterly shore of Lake Champlain opposite Crown Point, New York. Mr. Hanfield's buildings were on top of Ferry Hill, so-called, and about 20 rods from the Lake. The Ferry Hill road runs between the house and barn in a southwesterly direction and gradually nearing the Lake ends at a point or cape on the shore where there used to be a ferry to Crown Point, hence the name Ferry Hill. From here it has been the custom of those residing in that vicinity to go over to Crown Point on the ice in the winter along a route marked by bushes. Because of a current which makes the ice thin and dangerous opposite and northerly of the point on the shore, the route runs southerly for about 10 rods and then turns and runs westerly in a straight line to a ferry road on the New York side. The Lake is here one-half mile wide. Mr. Lapham was 62 years old and had been a town selectman for a number of years. He lived about 10 rods below Mr. Hanfield at about the middle of the hill, and was familiar with the Lake at this point and knew of the current and thin ice opposite the point. A week before the accident he had bushed out the road on the ice with the help of another man.

This was done by setting bushes 3 or 4 feet high, consisting of a branch and twigs, upright in the ice. These were staggered to mark out a road two rods wide so that the bushes on either side were about 200 feet apart. Mrs. Huestis was 24. Up to the time of her death she and her husband had lived for about five years in a cottage owned by Mr. Lapham near the Lake shore. Up to about three years before they had run the ferry, and after that she had continued to lease boats on the Lake while her husband followed the occupation of a salesman for a business in Middlebury. She knew of the current at that place. She had a daughter Lorraine born June 6, 1936. On the New York side the road from the Lake goes over a knoll about 100 feet from the shore. About one fifth of a mile from the Lake it passes the house of Max O'Dell, then crosses a railroad and intersects with the main highway leading north to the village of Crown Point. On the main highway a little south of the intersection is located the Speyer restaurant.

The accident happened on January 19, 1942. The weather was mild and it had rained. In the early afternoon Mrs. O'Dell saw a two door sedan coming from the direction of the Lake pass her house, and recognized the man riding on the rear seat as Charles Finn, a person she had known for some time. On the front seat was a man driving and a woman holding a child. At about 2 o'clock a party consisting of Mr. Lapham, Mr. Finn, Mrs. Huestis and her daughter came into the Speyer restaurant. After a little Mrs. Huestis asked Mr. Lapham if she could take his car, and then she and her daughter drove up town to do some visiting. She returned at about 5 o'clock, and for the next half hour she and Mr. Lapham talked about whether they would go home by the toll bridge or on the ice. She said several times that she was afraid to go back by way of the Lake, because there was so much water on the ice, and that she wanted to go by the bridge, and he several times answered that the ice was 16 inches thick and that it was plenty safe, that he had staked out the road and that she had ridden with him before and was never afraid. He said that he had staked out the road for years and that she would be perfectly safe. She finally said: "If you know that the Lake is safe, then I will ride back with you," and they went out and got into his car and

drove away at 5:30 to 5:45. As they drove away Lapham was at the wheel, Mrs. Huestis was sitting on the front seat beside him holding her daughter in her lap, and Finn was on the back seat. For some reason they returned in 5 or 10 minutes, and turned around in front of the restaurant and drove away for the last time seated in the same order. At about 6 o'clock Mr. and Mrs. O'Dell saw them pass their house going toward the Lake. They recognized Finn riding on the rear seat, and noted that a man was driving and that a woman holding a child was on the front seat beside him. Mr. O'Dell watched the car proceeding until its rear lights disappeared over the knoll 100 feet from the Lake. As the car came over this knoll, Mr. Hanfield from outside his buildings saw its lights and watched its progress from there on. As the car drove onto the ice it stopped long enough to shift gears, and then started across the Lake, but after the first 10 rods, instead of crossing on the bushed road, it bore north of this road and proceeded directly toward the place above referred to where the ice was thin. When it neared the Vermont shore, Mr. Hanfield, who had heard the purr of the motor on the way across, noticed that all at once the motor went dead, and that the lights went out and very soon came on again and disappeared. After going into his barn to speak to his hired man and to get a lantern he went down to the Lake, and found that the car had gone through the ice at a point about 150 feet north of the bushed road and 250 feet from the Vermont shore, and observed Mr. Lapham clinging to a cake of ice. He died before he could be rescued. On the next day the car was removed from the Lake and Finn's body was found inside. On the following day the bodies of Mrs. Huestis and her daughter were recovered, under circumstances indicating that they were drowned while holding on to each other. The ice where the car went through was 3½ to 4 inches thick. There were years that this area did not freeze over and it was good crossing where the road was bushed.

Defendant's motions raise questions of the sufficiency of the evidence to show that Lapham was guilty of either wilful or gross negligence, and to show that Mrs. Huestis was free from contributory negligence and did not assume the risk, and assert as a ground that a verdict for the plaintiff could not be reached without basing an inference upon one or more other inferences.

■ "Gross negligence" as used in P. L. 5113 is higher in degree and more culpable than ordinary negligence, it amounts to a failure to exercise even a slight degree of care, and to indifference to the duty owed a guest passenger and utter forgetfulness of his safety, and is more than an error in judgment, momentary inattention, or loss of presence of mind. *Shaw, Admr.* v. *Moore,* 104 Vt 529, 531, 162 A 373, 86 ALR 1139; *Franzoni* v. *Ravenna,* 105 Vt 64, 163 A 564; *Anderson* v. *Olson,* 106 Vt 70, 169 A 781; *Ellison* v. *Colby,* 110 Vt 431, 436, 8 A2d 637; *Kelley* v. *Anthony,* 110 Vt 490, 495, 8 A2d 641; *Peck* v. *Gluck,* 113 Vt 53, 29 A2d 814; *Barrows* v. *Powell,* 113 Vt 109, 29 A2d 708.

Here Mr. Lapham, a man who had bushed out the road over the Lake so as to avoid the thin ice opposite the point on the Vermont side, after assuring Mrs. Huestis that she would be perfectly safe, chose to drive north of the bushed road for almost the entire distance across the Lake directly toward a place which he knew to be dangerous. If by momentary inattention he got off the road at the outset, he should have immediately taken steps to find it again rather than to proceed blindly for nearly half a mile. Under the circumstances the jury could properly infer that the act of driving where he did was not due to error in judgment, momentary inattention, or loss of presence of mind, but amounted to a failure to exercise even a slight degree of care, and to indifference to his duty to his guests and utter forgetfulness of their safety, and constituted gross negligence. It is unnecessary to determine if such conduct also constituted wilful negligence.

■ The question as to whether or not the plaintiff has shown that Mrs. Huestis was free from contributory negligence is more difficult. Although the burden of proving freedom from contributory negligence was on the plaintiff, direct and affirmative evidence of due care on the part of Mrs. Huestis was not required. It was enough to carry the question to the jury to give evidence of such facts and circumstances as warranted an inference of due care on her part. *Higgins, Admr.* v. *Metzger,* 101 Vt 285, 294, 143 A 394; *Blaisdell* v. *Blake,* 111 Vt 123, 126, 11 A2d 215; *Bombard* v. *Newton,* 94 Vt 354, 357, 111 A 510, 11 ALR 1402; *Cummings, Admr.* v. *Town of Cambridge,* 93 Vt 349, 351, 107 A 114.

■ A guest passenger in an automobile must take reasonable

precautions for his own protection. He must act as a prudent man would act in the same situation. *Senecal* v. *Bleau,* 108 Vt 486, 494, 189 A 139; *Round* v. *Pike,* 102 Vt 324, 327, 328, 148 A 283; *McAndrews* v. *Leonard,* 99 Vt 512, 525, 134 A 710; *Lefebvre's Admr.* v. *Central Vermont Ry. Co.,* 97 Vt 342, 349, 350, 123 A 211; *Wentworth* v. *Waterbury,* 90 Vt 60, 64, 96 A 334. But he is not held to the same degree of watchfulness as is the driver, nor is he bound to anticipate that the driver will omit the exercise of proper care. *Senecal* v. *Bleau, supra; Round* v. *Pike, supra; Higgins, Admr.* v. *Metzger,* 101 Vt 285, 293, 143 A 394; *LeClair* v. *Boudreau,* 101 Vt 270, 273, 143 A 401, 63 ALR 1427. As said in the last case cited: "One so situated is not excused from all responsibility, but he may rely upon the driver's watchfulness, more or less according to circumstances, without forfeiting his right of recovery against one by whose negligence he is injured." For such a passenger to entirely neglect to look out for danger or to observe the manner in which the vehicle is being operated might be the conduct of a prudent person. It cannot be said that in every case and all the time he must be alert and look to discover danger, or that his failure to do so would be a failure to exercise due care. But while this is so, the law fixes no different standard for him than for the driver. Each is bound to use due care. What conduct on the passenger's part is necessary to comply with this duty must depend upon all the circumstances, one of which is that he is merely a passenger having no control over the management of the vehicle in which he is being transported. Whether reasonable care has been exercised by the passenger is ordinarily for the jury. *Clark* v. *Connecticut Co.,* 83 Conn 219, 223, 76 A 523, 525, a case cited with approval in *Leclair* v. *Boudreau, supra,* and in *Webster* v. *Canadian Pacific Ry. Co.,* 103 Vt 460, 467, 156 A 524. Thus, in *Leclair* v. *Boudreau, supra,* the plaintiff was riding through an intersection as a guest with one whom she knew to be an experienced driver. She was well acquainted with the locality and knew there was danger if cars approached from different directions at the same time. She was sitting on the front seat and had turned and was talking with her sister on the rear seat when run into by another car. Had she looked she could have seen this other car as it approached. Held that the jury would be warranted in draw-

ing an inference from her conduct that she was in the exercise of due care.

Mrs. Huestis was well acquainted with the Lake at this locality and knew that it was dangerous to drive in the area where the car went through the ice. There was no fog on the Lake, and although it was dark the headlights on the car would have picked up the bushes had they followed the road. Had she kept a sharp look out she might have discovered that they were not following the bushed road. However, she was riding with a near neighbor much older than herself who had just told her that he had staked out the road for years, and had assured her that she would be safe. She had ridden with him before. She was holding her daughter on her lap. As he drove upon the Lake he stopped or slowed down, indicating care, then started out on the bushed road. After about 10 rods he bore away from the road to the north or left, but so gradually that had she been looking she might have seen bushes near to her right side for some little distance. They were traveling rapidly and it could have been only a matter of a minute and a half before the dangerous area was reached.

All that could be expected of Mrs. Huestis was that she should keep such watch of the course taken by the car as a prudent person would have taken. We cannot say as a matter of law that a prudent person under the circumstances would or ought to have discovered that the car was off the road in time to have warned Mr. Lapham. Even if, during the short interval that it took to reach the dangerous area, Mrs. Huestis did discover that the car was off the road, it could reasonably be inferred from the circumstances that she did not do so in time to have effectually warned Mr. Lapham. See *Ingram's Admrs.* v. *Rutland R. R. Co.,* 89 Vt 278, 284, 95 A 544, Ann Cas 1918A 1191. It follows that a jury would be warranted in finding that she exercised due care.

■ The doctrine of assumption of risk implies that the person against whom it is invoked voluntarily, that is, by the exercise of free will and intelligent choice, has put himself in the way of danger which he knew and comprehended, or was so obvious that he must be taken to have known and comprehended it. *Watterlund* v. *Billings,* 112 Vt 256, 261, 23 A2d 540; *Landing* v. *Town of Fairlee,* 112 Vt 127, 130, 22 A2d 179; *Tinney* v. *Crosby,* 112 Vt

95, 105, 22 A2d 145; *Craig* v. *Parkhurst,* 111 Vt 486, 489, 18 A2d 173; *Hutchinson* v. *Knowles,* 108 Vt 195, 206, 184 A 705.

The evidence at most only tends to show that Mrs. Huestis assumed the risk of traveling upon the bushed road, where she would have been safe. It is clear from our previous discussion that it cannot be said as a matter of law that she assumed the risk of traveling in the course taken within the rule above set forth. This is well illustrated in *Doberrentz* v. *Gregory,* 129 Conn 57, 26 A2d 475. Nor does the record, taken most favorably to the plaintiff, show, as claimed by the defendant, an opportunity for Mrs. Huestis to save herself just before the car sank.

The defendant devotes several pages of its brief to an extended argument that the verdict could not have been reached except by basing an inference upon one or more other inferences. It first insists that the jury could not find that Lapham was driving and that Mrs. Huestis was a passenger at the time of the accident without indulging in speculation. We need spend no time with this. Seldom have we seen circumstantial evidence that was more convincing than upon this point. The reasoning in *Cummings, Admr.* v. *Town of Cambridge, supra,* 93 Vt 349, 107 A 114, a much weaker case, is very apt. The evidence really compels the inference that Lapham was driving and that Mrs. Huestis was a passenger on the front seat beside him.

The gist of defendant's argument is, that because a finding that Lapham was driving and Mrs. Huestis was a passenger must be based upon an inference, it cannot be found that he was negligent and she free from negligence without basing one inference upon another. As shown in *Gero* v. *John Hancock Mutual Life Ins. Co.,* 111 Vt 462, 479, 480, 18 A2d 154, where our cases are reviewed, our rule is that the only inferences of fact which the law recognizes are immediate inferences from the facts proved, and that a trier of fact may not legitimately find a fact by inferring its existence from another fact which has itself been found as the result of an inference. But a given state of facts proven to the satisfaction of the jury may give rise to two or more separate inferences, and in such a case one inference is not built upon another, each is drawn independently from the same evidence. In the Gero case death could be inferred from certain evidence, and from the

same and other evidence death by drowning could be inferred. In *Wellman, Admr.* v. *Wales,* 98 Vt 437, 441, 129 A 317, it could be inferred from the facts directly shown that the decedent was hit by an automobile and that the defendant was driving the automobile. In *Boguski, Admr.* v. *City of Winooski,* 108 Vt 380, 387, 187 A 808, it could be inferred from the facts directly shown that the bacillus of typhoid existed in the defendant's water system and that decedent contracted typhoid by drinking water therefrom.

So here, it was established that Lapham was familiar with the Lake in this locality and knew of the dangerous area; that he had himself bushed out the road on the ice; that he was driving the car a few minutes before it started to cross the Lake, and that Mrs. Huestis was then seated on the front seat beside him holding her daughter on her lap, and that Finn was seated on the rear seat; that when the car passed on the road leading directly to the Lake Finn was on the rear seat, a man was driving, and seated beside him was a woman holding a child; that the car proceeded directly to the Lake where it stopped, but only long enough to shift gears, then followed the bushed road for about 10 rods and then ran directly to the dangerous area where it sank; and that the bodies of Finn, Lapham, Mrs. Huestis and her daughter were recovered from the Lake at that point along with the car. From these facts the jury could infer that Lapham was driving the car at the time it sank, and also that he was guilty of gross negligence, without piling one inference upon another. From the same established facts it could be inferred that Mrs. Lapham was a passenger, and from these and other facts mentioned above, including the conversation at the Speyer restaurant, it could be inferred that she was in the exercise of due care.

There was no error in denying defendant's motions.

*Judgment affirmed.*