DONALD RAYMOND HALL, A MINOR, BY MARIE HALL, Guardian and Curatrix, Respondent, v. PHILLIPS PETROLEUM COMPANY, a Corporation, and LANK SHORES, Appellants.—No. 40098.—214 S. W. (2d) 438.

Division Two, September 13, 1948.

Motion for Rehearing or to Transfer to Banc, Overruled, November 8, 1948.

*Henry Depping, Hale Houts,* and *Hogsett, Trippe, Depping & Houts* for appellants.

*Fred F. Wesner, Harry C. Clark,* and *W. Raleigh Gough* for respondent.

[438] LEEDY, J.—Action for the alleged wrongful death of plaintiff's father, Raymond E. Hall, resulting from a collision on a public highway between tractor semi-trailer trucks, one of which was being operated by said Hall, for his employer, Schien, and the other (a gasoline transport) by defendant Lank Shores, for his employer, defendant Phillips Petroleum Company. Judgment for plaintiff for $10,000.00, and defendants appeal.

The submission was under the humanitarian doctrine, hypothesizing negligence on the part of defendants in failing to divert the course of the Phillips gasoline transport truck to the right, or to sound a warning of its approach. The only contested issues at the trial were those of negligence, and the amount of recovery. The questions on this appeal have also been sharply narrowed, the principal one being whether plaintiff made a submissible case.

The case is unusual in that plaintiff relies upon the testimony and extrajudicial statements of the defendant Shores, the sole surviving eyewitness, Hall having perished in the collision. Of this peculiar situation plaintiff's brief says: "Plaintiff was compelled to rely largely upon the testimony of his adversary and could only dispute that testimony by a showing of the physical facts apparent after the collision and by [439] showing conflicting statements by the defendant Shores." Plaintiff took Shores' deposition, portions of which, as well as a statement made by him at the scene of the accident to Officer Corl of the Highway Patrol, were offered and received as admissions against interest. He was present at the trial, and testified for himself and his co-defendant. Plaintiff stresses those portions of Shores' extrajudicial statement, deposition and testimony at the trial which are favorable to his (plaintiff's) theory of the case, but asserts that other portions (which are utterly destructive of any theory of humanitarian negligence on the part of defendants) may be disregarded for reasons hereinafter to be noted.

On the issue of the submissibility of plaintiff's case, defendants' specific contentions are: (1) That there was no substantial evidence that Shores saw or should have seen deceased in imminent peril in time thereafter to have averted the collision by swerving or sounding a warning; (2) That, in any event, Shores was under no duty to turn off the slab and onto the right shoulder, all of the evidence being to the effect that Shores was driving at the extreme right edge of the slab when the collision took place; and (3) That there was no duty to warn because there was no evidence that deceased was oblivious of the approach of the Phillips truck. The first of these contentions may reasonably be said to turn on whether Shores' statement made at the scene of the accident and his deposition, when contrasted with his testimony at the trial, demonstrate such inconsistency and self-contradiction that, the physical facts considered, the jury might infer that the Schien truck did not pull right to its own side of the center line, nor, when about 35 or 40 feet away, pull again to the left toward and thence into the Phillips outfit when it was too late to do anything to avoid the collision, all as testified to by Shores at the trial. The determination of the first contention may make it unnecessary to develop the others, and the statement of facts will be limited accordingly.

The casualty occurred about 7 A. M., on March 28, 1944, on U. S. Highway 50 approximately a mile east of Lees Summit in Jackson County, and adjacent to the Muckey farm. The highway runs east and west. It it concrete, 18 feet wide, divided by a center line marking the two traffic lanes, each lane being 108 inches in width. On the south side of the concrete there is, first, an abutting 4-foot gravel shoulder sealed with asphalt; then a 2-foot earth shoulder, plus 3 additional feet to the ditch. The same situation exists on the north

side. The weather was dry, and visibility good. Shores was driving east. His gasoline transport outfit consisted of a tractor (202 inches in length) and semi-trailer tank (24 feet in length), the over-all length of the coupled unit (because of the overlap of the tank on the tractor) being about 33 feet, 2 inches. The weight of his tractor was 8690 pounds; that of the trailer (empty) 8070 pounds; load at time of accident, 21,061 pounds; aggregate weight, 37,821 pounds. Hall was driving in the opposite direction, west. He was operating a tractor semi-trailer truck (van) for his employer, Schien Truck Lines. The weight of his load of freight was about 18,000 pounds. The length of his outfit was not shown, but from photographs it appears to have been about the same as the Phillips tractor and trailer.

The tractors were similar. Each had dual (rear) drive wheels, and single front wheels. The semi-trailers had, of course, no front wheels, but both were equipped with dual rear wheels. The outside edges of each set of wheels (both front and rear, tractors and trailers alike) were 93 inches apart, this figure representing the maximum width of each tractor. The semi-trailers were 94 inches wide, or one-half inch wider on each side than the wheels.

It is conceded that the vehicles collided south of the center line of the highway, i. e., in the eastbound traffic lane which was the proper lane for the Phillips truck to be in. They were traveling in opposite directions, and the collision, while not "head on," occurred in passing. The point of impact was about 10 feet back from the front of the Phillips tractor (to the rear of its cab). The outside dual tire of the left drive wheel of the Phillips tractor was torn off, and that tire blown out, and the rim bent. There was damage to the "skirt" [440] running along the side of the Phillips trailer, and its left rear dual wheels were broken off, and the rear axle broken. The Schien truck skidded northwest off the highway, and off the end of a culvert into a ravine. Photographs taken of it in the position at which it came to rest show the trailer upended, lying on its left side with the tractor portion a completely demolished and crumpled mass of ruins. None of the photographs of the Schien trailer show its left (contact) side. Its right side appears to have suffered no perceptible damage. There was no evidence as to the damage to the front part of the Schien tractor resulting alone from contact with the Phillips outfit. This was doubtless impossible to ascertain because of its final demolished condition. The Phillips outfit skidded east and north from the collision, caught fire and turned over crosswise of the highway. After the fire it was dragged to the north shoulder of the highway.

Shores' testimony at the trial was that as he approached the Muckey farm he was traveling "in the neighborhood of 35 miles an hour;" that he saw the Schien truck as it came over the hill to the east—an estimated block away; it was then traveling about a foot

over on the south (or wrong) side of the black center line of the highway; that when the Schien truck got about a half a block away, "he [Hall] pulled to his side, to the right," but "never entirely cleared the line;" however, there was room for the vehicles to clear. Asked if the south wheels of the Schien vehicle were "on" the black line, the witness answered he could not say because he "never looked at the line"—he was watching the side of the Schien truck, which was "about even" with the line, thus leaving the witness with his own 9 feet of pavement on which to drive. The Schien outfit was traveling an estimated 40 or 45 miles per hour. His examination proceeded thus:

"Q  Tell the jury what happened then.

A  When he was a half a block away, he pulled to his side, just clearing the line. When he got within about 30 or 35 feet of me he pulled toward me again.

Q  Within 30 or 35 feet of you?  A  That is right, just about the length of the truck.

Q  Then what did you do?

A  There wasn't anything for me to do at that time.

Q  Did you have time to get out of his way?  A  No.

Q  What happened?  A  We hit.

Q  Did you hit him?  A  No, sir.

Q  Did he hit you?  A  He was on my side, hit it back of my cab somewhere, I couldn't never tell where it hit; our tractors had cleared.

Q  Your tractors cleared?  A  Our tractors cleared—our cabs rather.  I can't say whereabouts it hit back of my cab."

After the collision his outfit swerved to his left, and turned over and burned up. Witness did not remember how he got out of the fire. After he got out he saw there was nothing he could do about his own outfit, so he went down to the Schien truck in the ditch; then Mr. Muckey or someone from his seed farm came up, and he was taken to the Muckey house. He couldn't remember very well what happened at that time because he was "burned, scared and shocked." He was given first aid by Mrs. Muckey and then went to a doctor at Lees Summit, then came back to the scene of the accident. Before seeing the doctor, he talked to the highway patrolman.

He cannot remember the details of his conversation with the officer, but remembers telling him the Schien truck came over to his side of the highway. At no time prior to the accident was any part of his equipment on or over the black line, or wrong side of the highway. He estimated the speed of the other vehicle, as it approached him, as 40 to 45 miles per hour.

On cross-examination Shores testified that when he first saw the Schien truck, he [witness] was just starting upgrade, and the Schien truck was just "coming over the hill." At that time witness was

just east of the culvert (where the Schien truck finally came to rest after the collision), and the two vehicles were about a "block" apart (he estimated a block to be between 250 and 300 feet). The Schien truck was then traveling 40 or 45 miles per hour, and his own "about 35." Witness at that time started to, and did pull as far over to the south edge of the concrete slab as he could [441] without getting off onto the shoulder. Hall had pulled to his right "over to the line" when he got about a half a block away—his wheels were on his side of the road—"the side of the van was just about even with the black line."

"Q What did you next notice? A When we were about the length of the truck apart, why, he pulled over to the south.

Q All right. Where did he pull to? A He pulled into my truck.

Q Well, all right. How far did he pull? What did you see him do? How far did he pull to the right? A Well, he would have had to pull right close to a foot over.

Q You say he pulled a foot over? A Well, he would have had to.

Q On to your side of the road? A Yes.

Q Now, you are certain about that? A From where I was at, yes.

Q And you say that that happened within—when your truck and his truck were within 35 to 40 feet of one another?

A That is right."

Shores had taken his foot off the gas, but was still traveling about 35 miles an hour. The turn made by the deceased "looked sudden" to him. He was so burned and scared he didn't know just what he told the patrolman, and did not remember whether or not he told him anything about the Schien truck turning into him when it was 35 or 40 feet away.

He further testified that he never blew his horn at any time from the time he first saw the Schien truck until the collision. From the time that he first turned his tractor and trailer over to the south edge of the concrete pavement (when he saw the Schien truck about a block away), he maintained that same position all the way up to the point of impact.

References to Shores' deposition are limited in plaintiff's statement as follows:

"Various portions of defendant Shores's deposition were offered in evidence by plaintiff. At one point he testified that the left wheels of the Schien truck were on the black line, then it 'pulled to his right slightly, and I thought we would clear—we were clear—and could pass clear.' At another point he said that the Schien truck pulled to his right 'slightly, and then pulled back'; 'before we had time to realize anything, we met.'

"At another part of his deposition he was asked these questions and gave these answers:

'Q And the place of collision was about how far from the top of the rise?

A About half-way, when I saw him.

Q About half-way?

A Yes.

Q Now, at the time you saw the Schien truck, before the collision, were the left wheels parallel with the black line there?

A How is that?

Q At the time you saw the Schien truck, was it coming in a straight line, going west, or was it angling off on one side or the other?

A It was coming straight.

Q Coming in a straight line?

A Yes, sir.

Q And did it change any, from the time you first saw it, up to the time of the collision, except to pull to the right slightly, as you testified?

A No.' "

We come now to the statement made by Shores to Officer Corl of the Highway Patrol (upon which plaintiff relies as contradicting Shores' deposition and testimony at the trial) as it appears in Corl's written report to his headquarters (which report was introduced in evidence by defendants), as follows: "I was going east and saw the other truck coming over the hill. He was over the black line on my side about a foot. I pulled over as far as I could to the right. The tractors had passed when we hit. I believe he was driving faster than I was. My truck was on fire before I could get it stopped."

Turning to Corl's testimony concerning the making of that statement, as elicited on direct examination by the plaintiff, only the following appears:

"Q I will ask you whether or not . . . you asked him [Shores] his version of the accident? A I did.

Q And I wish you would tell these gentlemen what he said.

A Mr. Shores, the driver of the Phillips truck, stated he [442] was traveling east on Highway 50 and he saw the Schien truck, which was traveling west, come over the hill. As it came over the hill it was approximately one foot, that is the left side of the Schien truck was approximately a foot, to the south of the center line of the highway.

Q All right. Tell these gentlemen whether or not he said at that time or made any statement with regard to the Schien truck turning to the right or to the north and then turning back into his path at a time when he was only within about a truck's length of it?

A Mr. Shores' statement at the time was that when the truck came into his vision or within sight, it was approximately a foot across the center line.

Q And he made no other statement with reference to the occurrence of the accident or claim as to how the accident . . .

A Yes, he stated that his vehicle was traveling approximately 35 miles per hour, it was his belief that the other truck was traveling faster than his vehicle.

Q Did he fix the speed of the other vehicle?

A Not definitely, other than he believed that it was traveling faster than his vehicle.''

On cross-examination it was developed that Shores had been burned as a result of the fire following the collision, and that he had received first aid from someone before making the statement. Asked whether or not he was ''attempting to take any detailed statement from him,'' Corl answered: ''I attempted to get in brief the actual facts contributing to the accident.'' In this connection it is to be noted that the witness had, up to this point, detailed nothing about what Shores had said with respect to his own position on the highway, and particularly whether he pulled over to the right as far as he could, or anything about the point of impact. The implication from the questioning on direct examination (''And he made no other statement with reference to the occurrence of the accident, or claim of how the accident . . .'') would seem to be a negation of any statement by Shores at that time of any other fact, except as to speed. It was not until on re-direct examination, and after defendants had offered Corl's report containing his version of Shores' statement, that the witness stated Shores had, as a part of the same statement, also said that he ''pulled over as far as I could to the right. The tractors had passed when we hit . . . My truck was on fire before I could get it stopped.''

The proof respecting ''the physical facts apparent after the collision'' (on which plaintiff relies in part) was fragmentary and inconclusive. Plaintiff does concede that from those facts the jury was warranted in finding that the collision occurred some four inches to one foot south of the center line (or wrong side) of the highway. There were no identifiable skid marks of either vehicle leading up to the point of impact. Officer Corl testified he found skid marks of the Schien truck leading from the point of collision. The nearest to the center line was one just north of the center line, a scraping mark made by the outside tire on the left dual. The closest point of the outside dual wheel was about six inches north of the center line. There was a tire mark made by the right dual wheel of the Phillips truck about four inches north of the south edge of the slab. It led in a northerly direction to the point where the Phillips outfit came to rest. Witness Corl was of the opinion that the force of the impact could have changed the course of both vehicles.

Plaintiff falls into the fundamental error of treating Shores' statement to Officer Corl as inconsistent with, or contradictory of, his

testimony at the trial. Of the word "Inconsistent," 42 C. J. S., p. 541, says: "A word of broad signification, implying contradiction, qualities which cannot coexist, not merely a lack of uniformity in' details; and judicially defined as meaning contradictory, inharmonious, logically incompatible; contrary, the one to the other, so that both cannot stand; mutually repugnant or contradictory. Things are said to be inconsistent when they are contrary the one to the other, or, so that one infers the negation, destruction, or falsity of the other . . ." While such statement of Shores was different from his testimony at the trial in the sense that it was lacking in [443] the details developed on the trial, nevertheless those details were entirely consistent with, and not opposed to, the facts related in his original statement. There is an analogy between this situation and that noticed in State v. Cook, 132 Mo. App. 167, 112 S. W. 710, where on cross-examination the prosecuting attorney was permitted (avowedly for the purpose of impeachment) to ask the defendant whether or not he had made certain 'statements on his trial in the police court. "All he [the prosecuting attorney] claimed was that he stated a fact on the trial in the criminal court which he did not state on the trial in the police court." One of the reasons for which this was held to be improper was that it did not impeach defendant's evidence. "Thus it has been held that the fact that a witness states at the trial something in addition to what he stated at the coroner's inquest will not permit his testimony at the inquest to be shown, where the two statements are not in conflict with each other." 28 R. C. L., Sec. 220, p. 635. Moreover, plaintiff's own evidence shows that when Shores made his statement at the scene of the accident, he was suffering from the effects of burns received in escaping from the flaming gasoline truck. The examination of Officer Corl concerning his interview with Shores is incomplete, and does not fully show what was said between them (as distinguished from Corl's conclusions in that regard). Certainly the jury would not have been authorized to find Shores purported to detail to Officer Corl all of the facts surrounding the accident. For this reason the statement should not be extended beyond what it literally says.

The situation here presented is unlike that in Gould v. Chicago, B. & Q. R. Co., 315 Mo. 713, 290 S. W. 135, where it was held that plaintiff was entitled, in support of a verdict in his favor, to take the benefit of testimony of the engineer that he saw the plaintiff in a position of peril when the locomotive was two car lengths away from him without accepting as true the engineer's testimony that he thereafter caused certain blasts of the whistle to be given (thus showing sufficient and timely warning was actually given). But in that case there was testimony of plaintiff's witnesses, that the whistle was not blown. In the case at bar there was no contradiction of Shores' testimony (as to the Schien truck turning left onto

the wrong side of the highway, and colliding with the gasoline transport truck) either directly, nor, we think, circumstantially, and hence plaintiff could not rely on the favorable parts of Shores' statement, deposition and testimony at the trial, and reject the unfavorable.

There being no substantial evidence that Shores saw or should have seen deceased in imminent peril in time thereafter to have averted the collision, the judgment in favor of plaintiff must be reversed. It is so ordered. All concur.