**Connie MARTIN, Respondent,**

v.

**Nora Belle SLOAN, Administratrix of the Estate of Rolla Alexander Sloan, deceased, Appellant.**

**No. 49995.**

Supreme Court of Missouri,

Division No. 2.

April 13, 1964.

---◆---

William H. Bruce, Jr., Centerville, Robert T. Smith, William L. Mason, Jr., St. Louis, for appellant.

Jackson, Thomasson & Dickerson, Cape Girardeau, Schnapp, Cooper & Graham, Fredericktown, for respondent.

STOCKARD, Commissioner.

In this action for wrongful death the jury awarded damages in the amount of $25,000 to the surviving widow, and the defendant has appealed from the ensuing judgment.

■ On January 24, 1961, a 1½-ton Ford flat-bed truck which was being driven by Farrell Lee Martin, the husband of plaintiff-respondent, collided head-on with a Chevrolet automobile in which Rolla Sloan and Virgil Voyles were riding. All three persons died as the result of the collision without making any statement concerning the cause or circumstances of the collision, and there were no other witnesses to the accident. The defendant-appellant is the administratrix of the estate of Rolla Sloan, alleged by respondent and apparently found by the jury, to have been the operator of the Chevrolet automobile. Appellant first contends that the trial court erred in overruling her motion for a directed verdict because the evidence was not sufficient to present a jury question on the issue of (1) whether Rolla Sloan was the driver of the Chevrolet automobile, and (2) whether the driver of the Chevrolet automobile was negligent. Appellant presented no evidence. We shall set forth respondent's evidence, and in the determination of the above issues we shall consider the evidence in the light most favorable to respondent and give her the benefit of all favorable inferences which reasonably may be drawn therefrom. Holmes v. McNeil, 356 Mo. 763, 203 S.W.2d 665, 668; Probst v. Seyer, Mo., 353 S.W.2d 798, 91 A.L.R.2d 1252.

At an indefinite time, but stated to have been "sometime a little after noon" of January 24, 1961, Rolla Sloan and Virgil Voyles were, for thirty minutes to an hour, at the Amsden Garage located a short distance west of the intersection of Highways 21 and 49 in Reynolds County. "Around 2:00 o'clock" Sloan and Voyles went to Barber's Store, which was located at the above intersection. Sloan went into the store, "talked just a very few minutes" with Jim Cozine, and purchased six cans of beer. He then "took off" in a 1958 Chevrolet automobile and headed south toward Centerville with Voyles sitting in the passenger side of the front seat. The automobile belonged to Thomas Voyles, who was not otherwise identified. The collision with the Martin Ford truck occurred between Barber's Store and Centerville on Highway 21 about 2.6 miles south of the intersection.

Highway 21, where the collision occurred, runs approximately north and south. It was of "blacktop" construction with a white center stripe. The day was extremely cold, the weather was partly cloudy but with good visibility for driving, and the highway was dry. After the collision the Ford truck was found on the east side of the highway headed north with the right rear dual wheels off the blacktop portion of the highway and on the shoulder of the highway. To the south of the truck, which was the direction from which it was traveling, and in the right hand side of the northbound traffic lane for a distance of fifty feet were "intermittent skid marks" leading to the left rear dual wheels of the truck. On the east shoulder of the highway there were "dashes" in the gravel leading to the right rear dual wheels of the truck. There were no skid marks north of the place of the collision. Immediately west of the truck, but in the east lane of the highway, there were

gouge marks in the pavement, described by the sheriff of Reynolds County as being "like chicken tracks" extending to within six inches of the centerline of the highway. Debris was scattered all over the highway, but the "main center" of the debris was four feet east of the centerline of the highway. The Chevrolet automobile was found in the ditch off the west side of the highway with the back wheels and the trunk shoved into the embankment. Extending from the area described as the "main center" of the debris there were some marks, identified by the sheriff as skid marks, leading west to the Chevrolet automobile. Photographs of the Ford truck and Chevrolet indicate that they, particularly the Chevrolet, were virtually demolished. The speedometer of the Chevrolet after the collision "showed 68 miles an hour." The lumber which had been on the truck was scattered along the highway, mostly on the east side, for a distance of 75 feet north of the truck. When found, both Sloan and Voyles were dead and lying on the highway immediately south of the Chevrolet, and it can fairly be said that from their positions no inference is reasonably permissible as to who had been driving. Martin was "under the driver's seat" in the cab of his truck and was fatally injured. The only evidence as to the time of the collision was the testimony of the sheriff that after being advised of its occurrence he drove "about two and one-half miles" to the scene and arrived there "probably between 1:30 and 2:00 o'clock, as I recall. I had just been back from lunch a short time."

■ Respondent's case was submitted to the jury on the theory that Sloan was the operator of the Chevrolet, and the question for decision is whether there was sufficient evidence from which a jury reasonably could find that fact. Proof as to who was driving the Chevrolet automobile must necessarily depend upon the principle, if applicable, that proof of the existence at a particular time of a fact of a continuous nature gives rise to an inference or rebuttable presumption that the fact exists at a subsequent time. We must first determine what facts, most favorable to respondent, the jury could find existed, and then determine whether those facts authorize the application of the above principle.

Sloan and Voyles were at Barber's Store only a "few minutes" and left "around 2:00 o'clock" headed toward Centerville. The collision occurred 2.6 miles distant at a time so that the sheriff, after being notified of it, could drive to the scene from Centerville and arrive "between 1:30 and 2:00 o'clock." These statements of time are necessarily estimates. But, since Sloan and Voyles stayed at the Amsden garage for thirty minutes to an hour, they could not have gone there after leaving Barber's Store and arrived at the scene of the collision within the time limitations shown by the evidence. The jury reasonably could find that Sloan and Voyles first went to the garage, and then to Barber's Store; that they then started toward Centerville, with Sloan doing the driving, and that at the time they were last seen they were 2.6 miles from the scene of the accident and driving toward it.

The general rule is stated in Suarez v. Thompson, Mo., 283 S.W.2d 584, 587, as follows: " 'Proof of the existence at a particular time of a fact of a continuous nature gives rise to an inference, within logical limits, that it exists at a subsequent time. * * * In other words, it will be inferred that a given fact or set of facts, the existence of which at a particular time is once established in evidence, continues to exist so long as such facts usually do exist. The inference is extremely faint in connection with matters of intrinsic impermanency; and where a fact or condition is not reasonably continuous in its nature, there is no presumption of its continuance. * *.' " See also 31A C.J.S. Evidence § 124. The contention of appellant is that the fact that one is operating an automobile at a given time or place is not a fact of a continuous nature which would authorize an inference, absent evidence to the contrary, that such fact continued to exist.

■ "The limits of time within which the inference of continuance possesses sufficient probative force to be relevant vary with each case. Always strongest in the beginning the inference steadily diminishes in force with lapse of time, at a rate proportionate to the quality of permanence belonging to the fact in question, until it ceases or perhaps is supplanted by a directly opposite inference. In other word, it will be inferred that a given fact or set of facts, the existence of which at a particular time is once established in evidence, continues to exist as long as such facts usually do exist." 31A C.J.S. Evidence § 124(1), pp. 223–224. It thus appears that whether, as a matter of law, an inference of continuance may be drawn depends upon the particular facts and circumstances of each case, and particularly with reference to time and distance between the established fact and the continued fact to be inferred.

■ It may be admitted that the fact that a person is operating an automobile is a fact of the nature to have a limited "quality of permanence," but it does not mean that at no time subsequent to the established fact may there be an inference of continuance. The courts have recognized that upon proof that a particular person was driving an automobile shortly prior to an accident, an inference that he continued as the driver, absent evidence to the contrary, may be permissible. Flick v. Shimer, 340 Pa. 481, 17 A.2d 332; Morgan v. Peters, 148 Pa.Super. 88, 24 A.2d 644; Claussen v. Johnson's Estate, 224 Iowa 990, 278 N.W. 297; Ohio Bell Tel. Co. v. Lung, 129 Ohio St. 505, 196 N.E. 371; Renner v. Pennsylvania R. Co., Ohio App., 103 N.E.2d 832; Huestis v. Lapham's Estate, 113 Vt. 191, 32 A.2d 115; and the annotation in 32 A.L.R.2d 988 at pp. 992–993 where the above cases are cited and discussed. See also, Sparks v. Southeastern Greyhound Lines, D.C.Miss., 173 F.Supp. 896, reversed on other grounds, 5 Cir., 283 F.2d 44; Sutton v. Tanger, 115 Cal.App. 267, 1 P.2d 521; Sigel v. Gordon, 117 Conn. 271, 167 A. 719;

Weidlich v. New York, N. H. & H. R. Co., 93 Conn. 438, 106 A. 323 (inference that a passenger in the back seat of an automobile remained there); Nicol v. Geitler, 188 Minn. 69, 247 N.W. 8. In some of these cases there were facts other than that of the identification of the driver of the automobile shortly before the collision. For example, in Nicol v. Geitler, supra, there was evidence that the passenger could not drive; in Sparks v. Southeastern Greyhound Lines, supra, the father permitted his son to use the automobile on the condition that he allow no one else to drive; in Morgan v. Peters, supra, the passenger had no drivers license; and in Claussen v. Johnson's Estate, supra, the person last seen operating the automobile was the owner. However, if the inference is permissible, these additional factors merely strengthen it; the inference is not destroyed by their absence.

■■ The record does not show what if anything in the nature of houses, stores, shops, taverns, and the like were between Barber's Store and the scene of the collision which might have been an inducement to Sloan and Voyles to stop on the way with a possible change of drivers, but this is a rural area and we can take judicial notice that there is no town or community between the two places. There also is no evidence as to the ability or inability of Voyles to drive an automobile. The distance between the place where Sloan was seen driving the automobile and the place of the collision was only 2.6 miles on a rural road, and the time difference could not have been more than a few minutes. Under these circumstances, and in view of the rule announced in the above cases, we cannot say, as a matter of law, that the fact established by proof, that is, that Sloan was driving the automobile when last seen, was so improbable of continuance that a jury could not reasonably infer, in the absence of evidence to the contrary, that such fact continued for 2.6 miles as to distance and for the relatively few minutes as to time until the occurrence of the collision.

We turn now to the question of whether a jury issue existed as to the negligence of Sloan in the operation of the automobile in that he failed to operate it upon the right (west) half of the highway. Appellant argues that no one saw the Chevrolet on the wrong side of the road, and that after the collision both it and the truck were found on their proper side of the road.

There is no question but that the collision occurred because either the Chevrolet automobile or Ford truck was on the wrong side of the highway, or because both vehicles were partially on the wrong side, that is, "riding the centerline." The jury could reasonably find that as the Ford truck approached the point of impact it moved to the right until its right wheels were approximately two feet east of the eastern edge of the blacktop. The "intermittent skidmarks" and "dashes" leading to the rear wheels of the truck practically preclude any other conclusion. There is no evidence from which it could be inferred that the truck was on the wrong side of the highway. While there was debris all over the highway, the "main center" of an eight-foot area of debris and some gouge marks in the pavement were all in the east lane which was the wrong side of the highway for the Chevrolet. Skid marks made by the Chevrolet started at the "main center" of the debris and extended westward across the highway to the Chevrolet automobile. This evidence of the location of the debris and of the gouge marks, and the evidence of the location of the skid marks made by the Ford truck and the Chevrolet constituted sufficient evidence from which the jury could infer that the point of impact occurred in the east lane of the highway, which was the wrong lane for the Chevrolet automobile, and the jury could find that in permitting or causing his automobile to cross over into the wrong side of the highway and into collision with the Ford truck Sloan was negligent in the manner submitted by respondent in her verdict directing instruction. See Thompson v. Jenkins, Mo., 330 S.W.2d 802; Lyon v. Southard, Mo., 323 S.W.2d 785; Brawley v. Esterley, Mo., 267 S.W.2d 655; Filkins v. Snavely, 359 Mo. 356, 221 S.W.2d 736; Ruby v. Clark, 358 Mo. 318, 208 S.W.2d 251; and the exhaustive annotation in 77 A.L.R. 2d 580.

Appellant next asserts that the trial court erred in refusing a mistrial "on account of improper injection of an issue of liability insurance into the case, * * *." Out of the presence of the jury, in a conference between counsel and the court, counsel for appellant agreed that "Allstate Insurance Company has a contingent interest in the outcome of this litigation." Counsel for respondent then stated: "* * * We will ask leave of the Court during the voir dire examination to ask one question, interspersed among all of the other questions, giving it no specific prominence, not making it the first question or the last question, asking the question whether any members of the jury panel are employees of, stockholders in, or agent for or employee of the Allstate Insurance Company, to go to the juror's qualifications." Permission to ask the question was granted. The transcript shows that during voir dire the following occurred:

"Mr. Thomasson: * * * Are any members of this panel employees of at the present time or at the present time stockholders of or officers in the Allstate Insurance Company?

"There is no answer by any of the jurors. [Apparently this comment was added by the reporter].

"Mr. Thomasson: (Continuing) Or policy holders in and with the Allstate Insurance Company?

"Mr. Bruce: If the Court please, at this time, I ask the Court to declare a mistrial. The question has deviated from the one that was approved.

"The Court: It has, certainly, but I do not think the seriousness would require a mistrial in this case. Continue, gentlemen.

"Mr. Bruce: I ask the Court to instruct the jury to disregard the last question.

"The Court: The objection will be overruled. Continue."

What occurred thereafter is not shown by the transcript.

Appellant admits in her brief that respondent had the right to determine, by appropriate means, whether any prospective juror had any disqualifying interest in the Allstate Insurance Company. See McCaffery v. St. Louis Public Service Co., 363 Mo. 545, 252 S.W.2d 361. Appellant's complaint is that "After assuring the Court that he would ask but *one* 'insurance' question to which he would give 'no specific prominence,' plaintiff's counsel, after asking the question once, and after clear indication on the part of the panel that the answer was negative insofar as juror-interest in the insurance company involved was concerned, and after a significant pause as indicated by the record * * * plaintiff's counsel asked a *second* 'insurance question,' the content of which was such that same could have been easily incorporated into the first question." There is no contention that the substance of either question, absent the agreement between court and counsel, was erroneous, and we cannot say that absent the ageement that the asking of either or both questions would have been prejudicial. See Gooch v. Avsco, Inc., Mo., 340 S.W.2d 665; Bullock v. Sklar, Mo.App., 349 S.W.2d 381, 90 A.L.R.2d 318; Haley v. Edwards, Mo., 276 S.W.2d 153; Shepard v. Harris, Mo., 329 S.W.2d 1, 12. Bad faith is not shown, and whether a mistrial should have been declared in the circumstances presented rests largely in the discretion of the trial court. Haley v. Edwards, supra. We seen no reason to say that that discretion was abused.

Appellant's next point is that the court erred in refusing to grant a mistrial "on account of the false statement made by plaintiff's counsel in opening statement and to the effect that it was admitted that the automobile 'came across the center line' at the time of the casualty." In the opening statement this occurred:

"Mr. Schnapp: * * * This wreck, with that evidence, and other evidence we will produce for you, definitely occurred on the right hand side of the road, on Farrel Martin's side of the road; and it has been admitted that he met his death as a result of this wreck, and the Chevrolet that came across the centerline and hit this truck * * *.

"Mr. Bruce: If the court please, I have not admitted that. I ask the Court to declare a mistrial at this time.

"The Court: I think you had better let counsel correct his statement. I do not think he meant * * *.

"Mr. Schnapp: I did not mean to say they admitted he came across the centerline. They have admitted that Farrel Martin met his death as a result of this wreck, that is all they have admitted. The evidence will show that the Chevrolet did not apply its brakes * * *.

"The Court: Let me inquire. Do you have an objection now you wish to make after the correction was made?

"Mr. Bruce: I repeat my objection and request that a mistrial be declared. The statement is so highly inflammatory that it is impossible to obtain a fair trial.

"The Court: I think not. Overruled."

In her brief appellant attempts to import intentional misconduct on the part of respondent's counsel, and by the statement that "the trial court was quick to jump in and to help plaintiff's counsel to say 'I didn't mean it,'" appellant apparently attempts to imply partiality on the part of the court. We cannot agree that such a charge or implication is justified. Appellant's counsel interrupted before the sentence

was completed, and it is not certain that the statement is subject to the interpretation placed on it by appellant. Whether it is would depend upon the inflection of voice and whether or not a pause occurred in the delivery. The trial court was present and heard the statement. An immediate and complete correction was made. In matters of this nature the trial court is in better position to judge the prejudicial effect, if any, of such occurrences, and of necessity it is vested with considerable discretion. State ex rel. Kansas City Public Service Co. v. Shain, 345 Mo. 543, 134 S.W. 2d 58, 124 A.L.R. 1331. There is no basis for saying that there was an abuse of discretion.

■ After the opening statement of respondent, counsel for appellant stated: "The defendants will reserve their opening statement." The court then said: "No, sir. This is a civil case. The rules require that you make your statement at this time. In criminal matters it can be reserved, but not in a civil case." It may be admitted that there is no rule of this court specifically governing the time that the opening statement by the defendant in a civil case should be made. It may be that the trial court was referring to a local rule, and it would have considerable discretion in determining by rule the orderly procedure of trial. In view of appellant's assertion that the trial court "went out of its way to lecture defendant's counsel" in rejecting her "legitimate request that she be allowed to reserve [her opening] statement," we shall quote a portion of appellant's argument as set forth in her brief to this court. She there states: "Defendant put on no evidence in this case, *and never intended to put on any,* recognizing long before this case was tried the inherent weaknesses of any case plaintiff could put on. She had a right to *hit the jury* with this fact at the close of plaintiff's case. Instead, she was forced by this improper ruling of the Court to state what only plaintiff's evidence would show, and her legitimate trial strategy was thereby wrecked." (Italics added). It thus appears

that appellant's real complaint is that she was denied the right to "hit the jury" at the close of plaintiff's case with an argument under the guise of a reserved opening statement when she intended to present no evidence. In these circumstances, at the close of plaintiff's evidence, there was nothing she could have said ethically in the form of an opening statement. We cannot agree that any "legitimate trial strategy" was denied appellant.

■ After the completion of the opening statements the following occurred:

"Mr. Bruce: If the court, please, the defendants, at this time, would like to request enforcement of the rule.

"The Court: We don't have any place to put these witnesses without taking them out of the court room. I certainly don't want to work a hardship on anyone. Our facilities here for separating these witnesses are not good.

"Mr. Schnapp: We have no objection to them remaining here. I don't know about the other side, your honor.

"The Court: If we had any facilities for providing for the separation, I would have no objection. Mr. Bruce, I don't see any real reason for it. If you have some reason that you would like to tell us out of the presence and hearing of the jury, we will be glad to hear it. Otherwise, I am just not going to do it.

"Mr. Bruce: That is my request, your honor.

"The Court: The request is denied."

There is no contention that the trial court erred in refusing to enforce the rule. The alleged error is that the trial court refused to grant a mistrial "on account of the Court's comments on defendant's motion that the witnesses be excluded from the courtroom, * * *." No request for a mistrial was made, and if made it would have been without merit. We do not agree

with appellant's assertion in the brief that by the above incident the trial judge "adopted and exhibited a disparaging if not hostile attitude toward plaintiff's [defendant's?] counsel."

Appellant next asserts that the trial court erroneously refused to grant a mistrial because of "improper and prejudicial conduct of the Sheriff of the county * * * who repeatedly, over defendant's objections and the Court's admonitions, volunteered his opinions from the stand on most vital, contested issues in the cause, i. e., the point of impact in the collision and the movements and positions of the vehicles and at the time of collision, as well as improperly referring to supposed desperate efforts of plaintiff's decedent to avoid the collision." In her argument appellant asserts that the sheriff "time and time again did just what we above say he did while on the witness stand."

Appellant does not set out in her brief the testimony referred to, but by page references she refers to seven incidents in the transcript. Our examination discloses that in five of the instances every objection made by appellant was sustained and every request to have the jury instructed to disregard a statement by the witness was granted. In one of the other instances the sheriff was asked to describe some tire marks. He replied: "Yes. Driving a truck myself some, I would have called it back here, approximately, 50 feet from where it started, what I would refer to as fanning the brake." Appellant's counsel said: "I object to that. He can tell what he saw, but not what he thought he did." The court then stated, "He may answer. Continue," and the witness replied: "I seen dashes made by two duals, something in this order, down to the truck on the blacktop, on this side." No request was made to strike the answer objected to, or that the jury be instructed to disregard either answer. In none of these six instances was there a request for a mistrial. Only two (or possibly only one for the reason hereafter noted)

of the above matters pertained to testimony concerning the point of impact.

The only assignment of error in the motion for new trial pertaining to testimony of the sheriff is that the court erred in refusing to grant a mistrial because of "The erroneous and prejudicial conduct of the sheriff, plaintiff's witness, in repeatedly, and after admonition of the court not to do so after sustaining plaintiff's objections thereto, referring to certain locations on the highway at the scene as being the place or point of collision or impact." However, as previously mentioned, the sheriff made reference to the point of impact once, and he also referred to "where the collision taken place," which could have been a reference to the general scene of the collision rather than the point of impact. On each occasion the court sustained the objection and took every remedial action requested by appellant. No request for a mistrial was made, and therefore, the trial court did not refuse a mistrial, and no prejudicial error occurred.

The remaining incident referred to occurred several pages later in the transcript. The sheriff was asked whether or not skid marks leading to the Martin truck "were freshly made," and the following occurred:

"A. From where the truck left the road, my observation was ——.

"Mr. Bruce: I object to that, that is certainly a conclusion of the witness.

"The Court: Yes, it is.

"Mr. Bruce: I am going to have to ask that the court declare a mistrial at this time. This witness has done this repeatedly over objection.

"The Court: The request for a mistrial will be denied. You may continue with your examination. Re-ask your question, please.

"Mr. Bruce: Would your honor instruct the jury to disregard the remark?

"The Court: The jury will be instructed to disregard the last remark of the witness."

This was the only request for a mistrial which appears on the pages of the transcript referred to in appellant's brief and it did not pertain to testimony concerning the point or place of impact.

The unresponsive statement, or possibly two statements, by the sheriff concerning the point of impact was not elicited by respondent's counsel, and there is nothing to indicate any bad faith on the part of counsel or witness. The objections were sustained, and the jury was instructed to disregard the statements when requested to do so. We find no merit to appellant's contention of prejudicial error. We note, in reference to testimony concerning the point of impact, that the following occurred during the cross-examination by appellant's counsel of a highway patrolman:

"Q. Were you asked this question [when questioned by an attorney but not on deposition], 'Was there any oil, water, glass or anything on the road there to indicate where on the road that the impact occurred?' You were asked that question, weren't you?

"A. Yes.

"Q. Did you give this answer, 'Yes, there was, sir, about eight feet in diameter, a large circle of oil and debris, which appeared to be the point of impact?' "

"A. I don't remember at this time the exact size of the debris. I was just saying the main center of it was in the northbound lane."

It thus appears that the only testimony of any witness concerning the place or point of impact, based on the location of debris or other conditions of the highway, which was permitted to remain in evidence, was brought out by appellant.

Exhibit A consisted of a paper board upon which two vertical and parallel lines were drawn representing the east and west edges of the blacktop pavement of Highway 21, with a broken line between the two lines representing the centerline of the highway. During the testimony of the sheriff he drew on that board two rectangles representing the location and position of the Ford truck and Chevrolet automobile at the time he arrived at the scene of the collision. He also drew thereon two circles showing the location of the bodies of Sloan and Voyles, a larger circle showing the general area of the gouge marks he described as "being like chicken tracks," several small marks showing the location of the "intermittent skid marks" and "dashes" made by the dual wheels of the truck, and marks to show the location of the lumber thrown from the truck. Appellant asserts that "no proper foundation for the use of the same was laid" and that it was error to use it because "by plaintiff's own evidence the use, or continued use, of said exhibit would tend only to confuse the jury."

When the sheriff was asked to draw on the exhibit the location of the truck, appellant objected "for the reason there is no way of making such diagram to scale and if it is not to scale it may be misleading." We find no objection to the use of the exhibit on the ground that "no proper foundation" was laid. During the direct examination of the sheriff he was asked what certain marks were which appeared in Exhibit G, a photograph, and he replied that they were "skid marks," and that they "led from the east side of the white line across over to the automobile." The following then occurred:

"Q. Can you plat those skid marks on this diagram in relation to the car and the truck?

"A. I am afraid, Mr. Schnapp, the jury or nobody else would be able to read this drawing.

"Q. You think it would make the drawing unintelligible, then I withdraw my question, * * *."

It is obvious from this, contrary to the assertion of appellant in her brief, that the sheriff's statement concerning the confusing feature of the exhibit was limited to the result if he attempted to draw thereon the location of the skid marks, and the request that he attempt to draw them was withdrawn. Exhibit A is before this court. It is of substantial benefit in understanding the testimony of the sheriff. The fact that the exhibit was not to scale is a matter of impeachment going to its weight rather than admissibility unless it is so incorrect to be misleading. State v. Brooks, Mo., 159 S. W.2d 646; State v. Smith, Mo., 357 S.W.2d 120, 123. When it is understood that the markings of the sheriff were not drawn to scale, and the jury was told that they were not, we see nothing in the use of the exhibit which would tend to confuse or mislead the jury, but on the contrary it unquestionably would tend to give the jury a better understanding of the testimony of the witness. See Collins v. Leahy, Mo.App., 102 S.W.2d 801; and 98 C.J.S. Witnesses § 327.

During oral argument the following occurred:

"Mr. Schnapp: "* * * She [respondent] would have her husband with her if it hadn't been for this incident. He would be supporting her and the children. Pay her so that if you see her on the street a week from today or a year from today or five years from today that you can look her in the eye and say * * *

"Mr. Bruce: I object to this, passion and sympathy is not involved in this decision. I ask that a mistrial be declared.

"The Court: The jury will understand what its obligation is in this case, Continue. The request for a mistrial will be denied."

We do not know what the remainder of the sentence would have been if it had been completed, and we assume that it was not completed because we have set out all that is shown by the transcript. It does appear, however, that what was said and what was contemplated probably would have been an improper appeal to sympathy. But, the only relief requested was a mistrial, which if granted would be a most drastic result. A trial court necessarily must be allowed a substantial degree of discretion in determining whether an incident such as this calls for a mistrial, and it also has the opportunity to review the effect of such argument when ruling on a motion for a new trial. See Marler v. Pinkston, Mo., 293 S.W.2d 385. We cannot say that the trial court abused its discretion in refusing the only request for relief made; a mistrial.

Appellant next challenges Instruction No. 1, respondent's verdict directing instruction, but that challenge is limited to the contentions that there was insufficient evidence to support the submissions that (1) Sloan was the driver of the Chevrolet automobile, and (2) that he was negligent in failing to drive on the right half of the road. Appellant also challenges Instruction No. 5, which defines the term "highest degree of care," on the ground that (1) there is no evidence that Sloan occupied such a status that the definition of the term "would apply to any duty owed on his part," and (2) "there is no evidence as to what the 'circumstances' of the collision were so as to make a standard of care based on 'the same or similar circumstances' at all applicable so as to make it possible for the jury to determine 'negligence' or 'negligently' under this instruction * * *." These contentions are ruled by our previous determination that respondent did present a jury case on the issues of whether Sloan was driving the Chevrolet automobile and whether he was negligent as such driver.

Appellant asserts that Instruction No. 4 "is a complete misdirection on the issue of burden of proof" because it provided, in part, that "As to the issue of the burden of proof being on plaintiff to prove *defendant* was negligent, you are instructed that * * *." (Italics added). Appellant

asserts that "there was no issue in this case as to any negligence on the part of the defendant," who was not Rolla Sloan but was the administratrix of his estate.

The use in this instruction of the term "defendant" instead of "defendant's intestate" or some other term could not possibly have confused or misled the jury to the extent that it brought in a verdict for the party not intended. If appellant was of the opinion that this oversight might have been confusing, just a word to the court would have brought about a correction. We are not impressed with the contention now made that the jury was misled or confused.

Appellant also challenges Instruction No. 2, the measure of damages instruction, because, she says, there is no evidence of (1) the value of support furnished to respondent by her husband, and (2) the extent of the financial burden "of supporting a family of two children cast upon plaintiff by reason of the loss of her husband." The instruction is also challenged because "it purportedly submits to the jury only 'pecuniary loss'" but "prejudicially refers to the statutory limit of $25,000.00 applicable in death cases, in spite of the fact that the evidence showed pecuniary loss to plaintiff in an amount far less than $25,000.00, and there was no proof nor submission of any aggravating circumstances which would have entitled the jury to go to the statutory limit for plaintiff in this case." In another point appellant contends that the verdict is "grossly excessive" because (1) it "bears no relation to any pecuniary loss to plaintiff," and (2) there were no aggravating circumstances shown. She then asserts that for these reasons "taken together with the misconduct of the Court, plaintiff's counsel, and plaintiff's witness" the verdict is "clearly the result of passion, bias, and prejudice in favor of plaintiff and against defendant," and a new trial must be awarded. In her last point appellant also contends that the verdict of $25,000 is excessive by $23,786.75 "because plaintiff showed pecuniary loss of only $1,213.25 [apparently referring to the amount of funeral expenses] and no aggravating circumstances were shown." She contends that if this cause is not "reversed outright" or a new trial granted, then this court "should order a remittitur of $23,786.75 herein." These three points will be considered together.

The evidence discloses that respondent, at time of trial, was twenty-one years of age, that she and Farrell Lee Martin were married on October 26, 1957, that there were two children born of this marriage, both living at time of trial, a girl Debra Luella, four years of age, and a boy Manuel Lee a little over two years of age. Respondent was living with her husband at the time of his death. Farrell Lee Martin worked for his father and had an income of "close to $300" a month. At the time of his death he was 26 years of age with a life expectancy of 40.18 years, and he was in good health and physical condition. Respondent and her children were totally dependent upon him for their support. The funeral expenses were $1,213.25.

The legislative intent, as expressed in Section 537.090, RSMo 1959, V.A.M.S., "is to give the jury a broad discretion in computing damages in actions for wrongful death, within the limit prescribed, based upon the pecuniary loss of every kind and character which, under all the circumstances of the particular case, will be sustained by those entitled to recover as a direct result of the death, and based also upon circumstances in mitigation or aggravation of the wrongful act, neglect, or default which caused it [when applicable]; and that this discretion given the jury in computing fair and just damages should not be interfered with unless it has clearly been abused." Steger v. Meehan, Mo., 63 S.W.2d 109, 115; Hartz v. Heimos, Mo., 352 S.W.2d 596; Domijan v. Harp, Mo., 340 S.W.2d 728. It is, of course, true that aside from regard to aggravating and mitigating circumstances, which were not submitted in this case, the recovery of damages under the

foregoing statute must be limited to the pecuniary loss to the beneficiaries. Patison v. Campbell, Mo., 337 S.W.2d 72, 75; Richeson v. Hunziker, Mo., 349 S.W.2d 50, 52. However, it has consistently been held that in determining pecuniary loss in a wrongful death case it is proper for the jury to take into account the deceased's earning capacity, Shepard v. Harris, Mo., 329 S.W.2d 1, and in an action for the wrongful death of the husband, as here, the jury may consider that the wife's pecuniary loss includes the additional burden of supporting minor children. Wilkerson v. Missouri Pac. R. Co., Mo.App., 69 S.W. 2d 299; Howard v. Thompson, Mo.App., 157 S.W.2d 780. In fact, it has been said that the law implies a pecuniary loss from the negligent killing of a woman's husband. Steinmetz v. Saathoff, Mo.App., 84 S.W. 2d 434.

We have found no case which supports appellant's contention that in an action brought by the widow for the wrongful death of her husband, in order for her to recover anything other than actual funeral expenses, she must present evidence "as to the value of the support" furnished her and as to the "extent of the financial burden" of supporting her minor children. Neither can we find a case that supports her contention that under the facts of this case she is entitled to a remittitur of all of the damages awarded except the actual funeral expenses, and we add that appellant cites no such cases.

 There is no testimony concerning what portion of her husband's income was used for the benefit of respondent, but she and the two children were totally dependent upon him, and in addition to respondent's personal pecuniary loss, she has now the support of the two minor children.

Respondent's evidence was not as complete as it should have been, but "the amount of damages to be awarded in this class of cases is necessarily speculative to a large extent and many elements and contingencies enter into the calculation, if indeed it can be called a mathematical calculation." Goyette v. St. Louis-San Francisco Ry. Co., Mo., 37 S.W.2d 552, 556; Heppner v. Atchison, Topeka and Santa Fe Railway Co., Mo., 297 S.W.2d 497. See also Brewer v. Rowe, 363 Mo. 592, 252 S.W.2d 372. Certain general rules may be given the jury in the form of instructions, and certain facts in the form of evidence are helpful, such as the earning capacity of the deceased, his life expectancy, the extent of dependency of the plaintiff, and the added financial burdens. But all of these are but mere guides and factual matters for the jury to consider in exercising a sound judgment. The award of damages in the amount of $25,-000 to a 21-year-old widow with two children, the oldest being four years of age, for the wrongful death of her 26-year-old husband who was their sole and only support and who was in good health with a life expectancy of over 40 years cannot be said as a matter of law to constitute an abuse of the discretion vested in the jury to determine the damages in the form of pecuniary loss in wrongful death cases.

The judgment is affirmed.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.